RONALD L. LERCH AND DALENE LERCH, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Lerch v. Commissioner
Docket Nos. 28299-83, 24683-84, 26729-85, 26730-85, 26731-85.
United States Tax Court
T.C. Memo 1987-295; 1987 Tax Ct. Memo LEXIS 295; 53 T.C.M. (CCH) 1101; T.C.M. (RIA) 87295; June 15, 1987. Merwin D. Grant, for the petitioners. Reid M. Huey and Elsie Hall, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: In these consolidated cases, respondent determined deficiencies in and additions to petitioners' Federal income tax as *299 follows: Additions to Tax
Docket No.
Petitioners
Year
Deficiency
6653(a)(1)
6653(b) [2]
24683-84
Ronald and
Dalene Lerch
1977
$14,829.75
$7,414.88
1980
55,723.15
$2,786.16
26730-85
Ronald and
Dalene Lerch
1978
34,264.00
17,132.00
28299-83
Ronald and
Dalene Lerch
1979
19,449.31
972.47
26729-85
Ronald Lerch
1981
132,602.34
66,301.77
26731-85
Dalene Lerch
1981
61,549.00
[3] 3,077.45
By Amendment to Answer filed December 23, 1985, and pursuant to section 6214(a), respondent asserted increased deficiencies and additions to petitioners' Federal income tax as follows: Increased Additions
Increased
to Tax
Docket No.
Petitioners
Year
Deficiency
6653(a)
6653(b)
24683-84
Ronald and
Dalene Lerch
1977
$11,215.25
$5,608.12
1980
27,729.85
$1,386.84
By Amendment to Answer filed March 21, 1986, and pursuant to section 6214(a), respondent asserted an increased deficiency in petitioners' 1979 tax in the amount of $50,649.67. In addition, respondent asserted that a part of the underpayment of tax for such year was due to petitioners' *300 fraud and, in lieu of the section 6653(a) addition, determined a section 6653(b) addition to tax in the amount of $35,049.49. After concessions, [4] the issues remaining for decision are: (1) Whether petitioners understated their taxable income each year as determined by respondent; (2) Whether petitioners are entitled to various deductions, exemptions, and tax credits in any amounts in excess of those allowed by respondent; (3) Whether petitioners are liable for the addition to tax under section 6653(a) for the taxable year 1980 and whether petitioner Dalene A. Lerch is liable for additions to tax under sections 6653(a)(1) and (a)(2) for the taxable year 1981; (4) Whether petitioner Ronald L. Lerch is liable for additions to tax under section 6653(b) for fraud for the taxable years 1977, 1978, 1979, *301 and 1981; and (5) Whether the assessment and collection of any tax and additions to tax is barred by the statute of limitations for the taxable years 1977 and 1978. *302 FINDINGS OF FACT I. Background Facts
Petitioners Ronald L. Lerch (Mr. Lerch) and Dalene A. Lerch (Mrs. Lerch), husband and wife, resided in Fort Wayne, Indiana, at the time each petition was filed in each of these consolidated cases. Petitioners filed joint Federal income tax returns (Forms 1040) for the taxable years 1977, 1978, 1979, and 1980. For the taxable year 1981, Mr. and Mrs. Lerch filed individual Federal tax returns (Forms 1040) with each claiming the filing status of married filing separately. Mr. and Mrs. Lerch were married in December of 1957. Mr. Lerch attended Indiana University and graduated with a bachelor's degree in 1958. He has a background in marketing and took two basic accounting courses in college. Petitioners have three children, a daughter and two sons. After graduating from high school, the children left home to attend college. The daughter began college in 1977 and the two sons began college in 1980 and 1981, respectively. Petitioner Dalene A. Lerch's educational background includes a high school diploma and one year of college. During the years 1977, 1978, and 1980, she was employed by Glenway Bargain Center, Inc., and petitioners *303 reported her wages from this employment on their joint Federal tax returns for those years. During the years in issue, petitioners maintained a joint checking account at the Anthony Wayne Bank in Fort Wayne, Indiana. [5] Mrs. Lerch occasionally made deposits to this account, but most deposits were made by Mr. Lerch. Mrs. Lerch received $150 a week from Mr. Lerch, usually on Mondays, to purchase groceries and other items she needed for the week. Occasionally, she needed more money to carry her through the week. When this occurred, she simply asked Mr. Lerch for more money. However, during the year 1979, Mrs. Lerch frequently overdrafted their joint checking account. In fact, she thinks she probably set a record for overdrafts in that year. Mr. Lerch made the necessary deposits to cover her overdrafts. Mrs. Lerch also had access to a Master Card from the Anthony Wayne Bank, on which Mr. Lerch made the monthly payments. *304 Mrs. Lerch made annual trips to Florida, usually in March, to pick up her grandmother and bring her back to northern Indiana. In addition, each October Mrs. Lerch usually took her grandmother to Pennsylvania to visit relatives. During 1979, Mrs. Lerch had access to and drove a new Oldsmobile Delta 88. In 1981, she had access to and drove a new Chrysler New Yorker. These cars were used for both personal and business purposes. Mrs. Lerch did not know how these cars were titled and was not involved with licensing or insuring either of these cars. At all times pertinent to this case, Mr. Lerch was president of Power-Hose Couplings, Inc., (hereinafter referred to as Power-Hose). [6]Power-Hose was a distributing and light manufacturing company, primarily dealing in electric motors, V drives, hydraulic fittings and hose assemblies, pulleys, sprockets, gears, bearings, power units, and conveyors. During the years in issue, Power-Hose employed between eight and twelve employees. As president, Mr. Lerch controlled the day-to-day operations of Power-Hose and approximately 35 to 40 percent of the company's sales were directly attributable to his efforts. Power-Hose filed 1979, 1980, *305 and 1981 U.S. Corporation Federal Income Tax Returns (Forms 1120), with the Internal Revenue Service. These corporate returns were signed by Mr. Lerch as president of Power-Hose. During the years in issue, both Mr. and Mrs. Lerch were officers of Power-Hose. In addition, petitioners were shareholders of Power-Hose during the years 1978, 1979, 1980, and 1981, and also served as directors during those years. [7] Except for serving as an officer and director during the years in issue and occasionally running errands for her husband, Mrs. Lerch had no other involvement with Power-Hose. She was never an employee of Power-Hose during any of the years in issue. *306 During the years 1977 through 1981, apart from his activity with Power-Hose, Mr. Lerch operated a business known as 20th Century Products, a manufacturer's representative for power transmissions, belts and pulleys, essentially the same kind of items sold by Power-Hose. Originally, 20th Century Products began as a partnership but no partnership returns were ever filed on its behalf. At least by 1979, Mr. Lerch was operating 20th Century Products as a sole proprietorship. At first, 20th Century Products' business location was the personal residence of Mr. Lerch's business associate. However, after the business associates split up, Mr. Lerch began conducting business for 20th Century Products from his office at Power-Hose. Petitioners reported a net profit of $1,947 from 20th Century Products on Schedule C of their joint 1980 Federal income tax return. Mr. Lerch reported a net profit of $11,845 from 20th Century Products on Schedule C of his individual 1981 Federal income tax return. Petitioners did not file a Schedule C for 20th Century Products for 1977, 1978, or 1979. Apparently, no employees worked for Mr. Lerch in connection with 20th Century Products. Mr. Lerch incurred *307 various automobile, travel and entertainment expenses in connection with his employment with Power-Hose. Power-Hose reimbursed Mr. Lerch for these and other expenses. Mr. Lerch simply wrote a memo to the accounting department listing his expenses for the month and a check was issued to cover the listed expenses. Mr. Lerch never provided any receipts to the accounting department for these expenses, because he did not want his employees to know the nature of his expenses. [8] Mr. Lerch failed to produce any of these receipts at trial. From 1979 through 1981, Power-Hose paid Mr. Lerch's expenses incurred on duck hunting trips when he was accompanied by customers. Power-Hose also paid for newspapers delivered to his residence and for magazine subscriptions that Mr. Lerch considered business related. [9]
*308 During the years in issue, petitioners owned various rental properties. Petitioners originally managed these properties under the name R. L. Lerch and Sons but later changed the name to Fort Wayne Property Management. During 1979, Bonnie Brotherton, an employee of Power-Hose, maintained the checking account for Fort Wayne Property Management. She was not, however, separately compensated by petitioners for this service. [10] During the years 1979, 1980, and 1981, all rents collected by Fort Wayne Property Management were derived exclusively from Power-Hose. *309 William Andorfer, a Certified Public Accountant since 1958, was at all times pertinent to this case employed by and was the treasurer of the accounting firm of Leonard J. Andorfer & Company, Inc., a professional corporation that employed approximately 12 accountants. Mr. Lerch and Mr. Andorfer had known each other since grade school and Mr. Andorfer had done a considerable amount of accounting and tax work for Mr. Lerch beginning in the early sixties. Mr. Andorfer prepared petitioners' Federal income tax returns for all the years in issue. He also prepared the corporate tax returns for Power-Hose, and occasionally prepared Federal tax returns for petitioners' children. Mr. Andorfer prepared Federal tax returns for Chris and Tracey Lerch, petitioners' sons, for the taxable years 1980 and 1981 and prepared Federal tax returns for Kimberly Lerch, petitioners' daughter, for the taxable years 1977 through 1981. [11] Mr. Andorfer charged Power-Hose for preparing petitioners' Federal tax returns, both joint and individual, for the years in issue. He also charged Power-Hose for preparing Kimberly Lerch's Federal tax returns for all the years in issue and for preparing Chris Lerch's tax *310 return for the taxable years 1980 and 1981. [12]
With respect to petitioners' joint Federal tax returns for the taxable years 1977, 1978, 1979, and 1980, Mr. Andorfer prepared these returns based on either oral or written information furnished by Mr. Lerch. Mr. Andorfer did not recall ever seeing any of Mr. Lerch's books and records. Generally, Mr. Lerch gave Mr. Andorfer a summary sheet of his income and expenses from which Mr. Andorfer prepared petitioners' *311 tax returns. With respect to the taxable year 1981 when petitioners filed separate returns, Mr. Lerch furnished Mr. Andorfer all of the information that was used to prepare both of these returns. Mr. Andorfer never asked Mrs. Lerch for and never received any information from her regarding the preparation of any tax return for any of the years before the Court. After preparing petitioners' Federal tax returns for each of the years in issue, Mr. Andorfer forwarded the completed returns to petitioners for their signature. Following normal procedure, he included instructions with each return as to when to file, where to file, and the amount of money, if any, they were required to pay. He also included any special instructions peculiar to that return. Petitioners both signed their joint Federal income tax returns for the taxable years 1977, 1978, and 1980, and each petitioner signed his or her respective 1981 individual Federal income tax return. Petitioners' 1979 joint Federal income tax return was originally filed without their signatures, but both of them subsequently executed a declaration under the penalties of perjury with respect to that return. During the years in issue, *312 petitioners reported adjusted gross income (AGI) and taxable income and paid Federal income taxes in the amounts as follows: Year
Return
AGI
Taxable Income
Tax Paid
1977
Joint
$25,529
$14,895 $1,191 1978
Joint
17,219
11,685
528
1979
Joint
18,609
15,788
1,190
1980
Joint
19,041
13,522
1,016
1981
Separate (Ronald)
33,772
17,943
4,480
1981
Separate (Dalene)
[13] 12,000
12,562
2,311
However, on personal financial statements submitted to the Anthony Wayne Bank in Fort Wayne, Indiana, petitioners reported a dramatic increase in their net worth in the period from 1976 to 1980. For the taxable years 1976, 1978, and 1980, petitioners reported their net worth in the amounts of $80,000, $379,726.50, and $1,292,599, respectively. Mr. Andorfer stopped preparing petitioners' Federal income tax returns in early 1983 or 1984. About this time, Mr. Andorfer first learned of the existence of Swiss bank accounts that led him to believe Mr. Lerch was not providing him with all the information *313 necessary to properly prepare petitioners' tax returns. Consequently, Mr. Andorfer terminated his business relationship with petitioners. [14]
II. Unreported Income Items
A. Sale of Maumee Property
On or about November 11, 1965, petitioners purchased rental property located in Allen County, Indiana, at 3032 Maumee Avenue, Fort Wayne, Indiana (hereinafter referred to as the Maumee property) for the amount of $50,000. For a period of time, Power-Hose rented the Maumee property from petitioners for use as its place of business. Petitioners received rental income from Power-Hose and occasionally received income from the rental apartments located in the upstairs of the building. For purposes of depreciating the Maumee property, petitioners allocated $3,000 of the purchase price to the land and $47,000 to the building. In 1974, petitioners made improvements to the Maumee property totaling $1,363 bringing their total cost or other basis in the Maumee property to $51,363. Petitioners also purchased furnishings for the Maumee property totaling $7,166. Prior to the taxable *314 year 1977, petitioners had claimed accumulated depreciation with respect to the building, improvements, and furnishings in the amounts of $15,745, $682, and $5,923, respectively. On or about November 26, 1976, petitioners entered into an agreement to sell the Maumee property for the amount of $100,000. [15] Settlement of the sale was held on April 13, 1977, at which time petitioners executed a Warranty Deed on the Maumee property and received a cashier's check from the buyers in the amount of $63,164.17. [16]
*315 Petitioners did not report the sale of the Maumee property on their 1977 joint Federal income tax return. Moreover, petitioners deducted a full year's depreciation on the Maumee property in 1977 in the amount of $1,683. In gathering his tax information for 1977, Mr. Lerch failed to inform Mr. Andorfer of the Maumee property sale. [17] Moreover, Mr. Lerch never filed an amended return for that year to include the amount of gain recognized on the sale or to adjust the amount of depreciation claimed on the Maumee property for 1977. *316 B. Foreign Sourced Income
1. Unreported Interest Income
On September 9, 1976, petitioners deposited the amount of $344,977.24 (Canadian dollars) in a passbook savings account with the Canadian Imperial Bank of Commerce in Quebec, Canada (hereinafter sometimes referred to as the Imperial Bank). The account was styled in the name of Ronald Lee Lerch and/or Dalene A. Lerch in trust for Kemberley [sic], Chris, and Tracy [sic] and was assigned account No. XX-X4168. The sole signatories on this account were Ronald Lee Lerch and/or Dalene A. Lerch which authorized either or both of them to sign on that account. The Imperial Bank did not require any written documentation in order for parents to open a trust account for the benefit of their children. A simple oral request by the parents was sufficient to open such an account. Petitioners have never produced any written instrument or other agreement depicting the terms of any purported trust established at the Imperial Bank. At all times pertinent to this case, petitioners maintained and exercised complete control and dominion over account No. XX-X4168. Petitioners never filed any gift tax returns with respect to *317 the initial transfer of funds in any of the years in issue. Moreover, petitioners never filed any fiduciary tax returns (Forms 1041) or any information returns, required with respect to foreign trusts, for any of the years in issue. In addition, petitioners' children, Kimberly, Chris, and Tracey, did not report as income any of the interest or gains credited to account No. XX-X4168 during any of the years in issue. [18]
During the years 1976 through 1981, the funds of account No. XX-X4168 were invested in term deposits and Canadian Treasury bills. These investments were acquired by debiting the account for the principal purchase amount. The account was credited periodically for the interest earned on the term deposits and credited with the principal amount upon maturity. With respect to the Canadian Treasury *318 bills, the gain realized and the principal amount were credited to the account on the date of maturity. These investments were rolled over regularly during the years in issue. From September 10, 1976 to April 25, 1980, 28 term deposits were purchased with the funds maintained in this account. These term deposits were purchased in the name of Ronald Lee Lerch and/or Dalene A. Lerch in trust for Kemberley [sic], Chris and Tracy [sic]. The Imperial Bank withheld amounts for nonresident tax during the years 1976 through 1980 with respect to the interest earned and credited to this account. The following table sets forth in Canadian and U.S. dollars the amounts of interest earned on these term deposits and credited to account No. XX-X4168 and the amounts of nonresident tax withheld during the taxable years 1977 through 1980: Year
Canadian Dollars
U.S. Dollars [19]
Interest
Withholding
Interest
Withholding
1977
$33,147.22
$4,972.09
$30,804.98
$4,620.71
1978
34,527.89
5,179.19
30,041.28
4,506.17
1979
51,118.75
7,667.83
46,653.73
6,521.00
1980
21,433.38
3,215.00
18,319.51
2,739.27
*319 During the year 1981, the Imperial Bank account No. XX-X4168 was credited with interest in the amount of $1,137.41 (Canadian) or $947.36 (U.S. dollars) but no nonresident tax was withheld in that year. The Imperial Bank mailed a Form NR4 (Supplementary Form) to petitioners for each of the years 1977 through 1980, reflecting the amount of interest paid in Canadian dollars and the amount of nonresident tax withheld in Canadian dollars with respect to such years. On their joint 1977 Federal income tax return, petitioners did not report as income any of the interest credited to account No. XX-X4168 for that year. In supplying Mr. Andorfer with the necessary information to prepare petitioners' 1977 joint tax return, Mr. Lerch failed to inform Mr. Andorfer of the Imperial Bank account maintained in Canada. Thus in preparing this return, Mr. Andorfer did not list the Imperial Bank in Part I of Schedule B as a source of interest during 1977. Moreover, after Mr. Andorfer prepared petitioners' 1977 tax return, the return was forwarded to petitioners for their signatures with specific instructions to answer the questions in Part III of Schedule B pertaining to Foreign Accounts and Foreign *320 Trusts. [20] Mr. Andorfer had been specifically instructed by Mr. Lerch not to fill out this portion of Schedule B. Petitioners filed their joint 1977 Federal income tax return without completing Part III of Schedule B attached to their Form 1040. *321 On their joint 1978 Federal income tax return, petitioners reported interest income from the Imperial Bank in the amount of $1,851, but the location of Imperial Bank was not disclosed. Again, Mr. Andorfer was specifically instructed by Mr. Lerch not to fill out Part III on Schedule B pertaining to foreign accounts. However, after this tax return was prepared by Mr. Andorfer, it was returned to petitioners for their signatures with instructions to complete Part III of Schedule B. Prior to filing petitioners' 1978 joint Federal income tax return with the Internal Revenue Service, Mr. Lerch placed an "X" in Part III of Schedule B under the "Yes" column with respect to the first question. [21] Thus, on this return, petitioners acknowledged the existence of a foreign financial account in which they had an interest in or signature or other authority over at some point during 1978. The second question, pertaining to foreign trusts, was not answered. *322 On their joint 1979 Federal income tax return, petitioners reported interest income from the Imperial Bank in the amount of $444. On Mr. Lerch's instructions, Mr. Andorfer completed Part III of Schedule B and answered the first question "Yes" and the second question "No." Mr. Andorfer also attached Form 90-22.1 (Report of Foreign Bank and Financial Accounts) to petitioners' 1979 tax return for Mr. Lerch's signature. Relying on information furnished by Mr. Lerch, Mr. Andorfer checked line 7 of this form indicating that the total maximum value of all foreign bank accounts did not exceed $10,000 at anytime during such year. [22] Mr. Lerch did not sign that Form 90-22.1, but the form was filed with the Treasury Department. That was the only Form 90-22.1 filed during the years involved in this case. *323 On their joint 1980 Federal income tax return, petitioners did not report any interest income on Schedule B credited to account No. XX-X4168 during 1980. However, in Part III of Schedule B, the first question was answered "Yes" and the second question was answered "No." After preparing this return, Mr. Andorfer attached Form 90-22.1 and returned it to petitioners for their signatures. Again, line 7 of Form 90-22.1 was checked indicating that the aggregate value of all foreign bank accounts did not exceed $10,000 at anytime during such years. The record establishes that petitioners never filed this Form 90-22.1. On their individual 1981 Federal income tax returns, neither petitioner reported on Schedule B any interest from the Imperial Bank. However, Part III of Schedule B was completed on both of these returns. On Mr. Lerch's 1981 tax return, the first question in Part III of Schedule B was answered "Yes" and the second question answered "No." On Mrs. Lerch's 1981 tax return, both questions in Part III of Schedule B were answered "No." Mr. Andorfer answered the questions in Part III of Schedule B on Mr. Lerch's 1981 tax return as directed by Mr. Lerch. In addition, Mr. Andorfer *324 attached Form 90-22.1 to Mr. Lerch's 1981 tax return with specific instructions to complete this form before mailing. However, line 7 of Form 90-22.1 was not checked by Mr. Andorfer as it had been for the years 1979 and 1980. The record establishes that this Form 90-22.1 was never filed. 2. Unreported Short-Term Capital Gains
On April 25, 1980, the first Canadian Treasury bill was purchased with funds maintained in the Imperial Bank account No. XX-X4168. From April 25, 1980 through August 7, 1981, 12 Canadian Treasury bills were purchased with funds from this account. Each Treasury bill was purchased by simply debiting the account with the principal purchase amount. Petitioners received a confirmation statement from the Imperial Bank with respect to each debit entry for the purchase of each Canadian Treasury bill during the years 1980 and 1981. As each Canadian Treasury bill matured, [23] the amount of gain and the principal purchase amount were credited to account No. XX-X4168. All the Treasury bills purchased with funds from this account were kept at the Imperial Bank for safekeeping. The Imperial Bank sent statements to petitioners reflecting the computation of *325 gain on each Canadian Treasury bill that petitioners purchased and sold during the years 1980 and 1981. The gains realized on the purchase and sale of Canadian Treasury bills reflected in both Canadian and United States dollars and credited to account No. XX-X4168 during the years 1980 and 1981 are as follows: Acquisition
Redemption
Sale Price
Cost
Date
Date
Canadian $ Canadian $ 1980
04/25/80
06/27/80
$477,000 $464,884.20
06/27/80
08/01/80
477,000
471,795.93
08/01/80
10/31/80
495,000
482,956.65
10/31/80
11/28/80
498,000
493,757.04
Total
1981
01/28/80
01/09/81
$505,000 $497,753.25
10/09/81
02/06/81
511,000
504,423.43
02/06/81
03/06/81
517,000
510,268.66
03/06/81
04/03/81
523,000
516,347.44
04/03/81
05/01/81
529,000
522,387.50
05/01/81
06/05/81
529,000
520,467.23
06/05/81
07/03/81
537,000
529,385.34
07/03/81
08/07/81
546,000
536,608.80
Total
Taxable
Acquisition
Exchange
Gain
Date
Gain
Rate
U.S. $ 1980
04/25/80
$12,115.80
.8704
$10,545.59
06/27/80
5,204.07
.8636
4,494.23
08/01/80
12,043.35
.8511
10,250.09
10/31/80
4,242.96
.8410
3,568.32
Total
$33,606.18
$28,858.23
1981
01/28/80
$ 7,246.75
.8418
$ 6,100.31
10/09/81
6,576.57
.8366
5,501.95
02/06/81
6,731.34
.8333
5,609.22
03/06/81
6,652.56
.8442
5,616.09
04/03/81
6,612.50
.8350
5,521.43
05/01/81
8,532.77
.8334
7,111.21
06/05/81
7,614.66
.8322
6,336.92
07/03/81
9,391.20
.8050
7,559.91
Total
$59,358.35
$49,357.04
*326 On August 7, 1981, Mr. Lerch authorized the Imperial Bank to issue a bank draft from account No. XX-X4168 in the amount of $546,000. On August 7, 1981, bank draft No. Y 355063 of the Imperial Bank was drawn payable to Ronald Lerch in the amount of $546,000. The bank draft was endorsed by Mr. Lerch and negotiated at the Societe de Banque Suisse (Canada) in Montreal on the same day. The Societe de Banque Suisse (also known as the Swiss Bank Corporation (Canada) and SBC Financial Limited) credited the amount of $546,000 to the account of Mr. Ronald Lerch, with instructions from Mr. Lerch to transfer such funds to the Bank's Winterthur office in Zurich to be invested in 90-day Canadian Treasury bills. On August 10, 1981, SBC Financial Limited transferred these funds to its Winterthur office. The record does not disclose what happened to these funds after they were transferred to a Swiss bank account. On their joint 1980 Federal income tax return, petitioners did not report as income any of the gains from the sale of Canadian Treasury bills credited to account No. XX-X4168 during 1980. In addition, on their individual 1981 Federal income tax returns, neither Mr. nor Mrs. Lerch *327 reported as income any of the gains from the sale of Canadian Treasury bills credited to account No. XX-X4168 during 1981. C. Unreported Commissions
During the taxable year 1979, Power-Hose issued checks totaling $19,342.09 to 20th Century Products, a company Mr. Lerch operated as a sole proprietorship. Petitioners did not file a Schedule C for 20th Century Products with their 1979 tax return and did not report any income for 20th Century Products for such year. Prior to filing petitioners' 1979 return, Mr. Lerch did not discuss with Mr. Andorfer whether the checks received from Power-Hose during 1979 represented taxable income to 20th Century Products in such year. In fact, Mr. Lerch did not disclose to Mr. Andorfer that 20th Century Products existed in 1979. During the period April 3, 1981 to November 12, 1981, Dynacraft Company, a division of Paccar, Inc., issued checks to Ronald L. Lerch, 20th Century Products, totaling $15,750.07 in payment of his sales commissions. On his individual 1981 Federal income tax return, Mr. Lerch reported gross receipts for 20th Century Products in the amount of $50,496. There is no probative evidence in the record that the $15,750.07 *328 sales commissions are included in this gross receipts figure. [24]
III. Deductions, Exemptions, Tax Credits --- Various Adjustments Made for Lack of Substantiation
By statutory notice of deficiency dated July 1, 1983, respondent disallowed for lack of substantiation the following deductions, exemptions, and credits on petitioners' joint 1979 Federal income tax return: Schedule C Expenses
Operating expenses
$1,727
Depletion
794
Capital Loss
3,000
Rental Property
Depreciation
6,372
Interest Expense
6,087
Repairs
4,851
Entertainment & Travel
21,799
Itemized Deductions
(Excess of Zero Bracket
amount)
2,821
Political Contributions Credit
100
Exemptions (children)
3,000
Due to the increase in petitioners' self-employment income, respondent recomputed petitioners' self-employment tax. Respondent also determined that part or all of the underpayment of tax was due to negligence under section 6653(a). By statutory *329 notice of deficiency dated April 10, 1984, respondent made various adjustments to petitioners' 1977 and 1980 taxes. Respondent determined that petitioners failed to report taxable gain in 1977 from the sale of the Maumee property in the amount of $32,394.58. Respondent also reduced the amount of depreciation claimed on the Maumee property in 1977 to $561 to correspond with the period petitioners owned the property during that year. For 1980, respondent determined that petitioners failed to report dividend income in the amount of $10,241 from Canadian securities. See n. 27, infra. In addition, respondent determined that petitioners received constructive dividends in the amount of $31,271.92 from Power-Hose during 1980 resulting from the payments by Power-Hose of petitioners' personal expenses and increased their taxable income accordingly. The following is a list of those personal expenses: Auto Expense
$ 3,887.24
Travel and Entertainment
15,402.39
Legal and Professional
7,800.00
Legal and Professional
3,656.45
Life Insurance - Officers
525.84
$31,271.92
Respondent also disallowed for lack of substantiation the following deductions totaling $43,205 *330 that petitioners claimed on their 1980 tax return and increased their taxable income accordingly since petitioners failed to establish that such amounts were paid or were paid for the purpose indicated: Excess Itemized Deductions
$ 5,519
Purchase - Schedule C
9,332
Schedule C - Oil Wells
948
Rental Expenses
20,463
Employee Business Expenses
6,943
Total
$43,205
In addition, respondent disallowed for lack of substantiation the long term capital loss carryover that petitioners claimed in the amount of $3,210. Based on petitioners' net short-term capital gain of $1,209 reported on Schedule D and the claimed net capital loss of $1,001, respondent increased their 1980 taxable income by $2,210. Finally, respondent determined that part of the underpayment of tax for the taxable year 1977 was due to fraud under section 6653(b) and that part of the underpayment of tax for the taxable year 1980 was due to negligence or intentional disregard of the rules and regulations under section 6653(a). By statutory notice of deficiency dated April 12, 1985, respondent determined that in the taxable year 1978 petitioners received unreported interest income on term *331 deposits with the Imperial Bank in Canada in the amount of $40,934 (U.S. dollars). Respondent allowed petitioners a foreign tax credit in the amount of $6,140. On brief, respondent concedes that the correct amount of unreported interest income from the Imperial Bank in such year is $30,041.28. Respondent also determined that all or part of the underpayment of tax for 1978 was due to fraud under section 6653(b). By statutory notice of deficiency dated April 12, 1985, respondent determined that in 1981 Mr. Lerch failed to report short-term capital gains totaling $71,393 from transactions involving Canadian Treasury bills. Respondent further determined that Mr. Lerch failed to substantiate the $18,116 commodity loss reported on Schedule D and increased his taxable income accordingly. In addition, respondent determined that in 1981 Mr. Lerch received unreported interest income in the amount of $1,413.66 (U.S. dollars) from the Imperial Bank. Respondent also determined that Mr. Lerch failed to report in 1981 nonemployee compensation in the amount of $15,750 received from Dynacraft Company, a division of Paccar, Inc. Respondent also determined that during 1981 Mr. Lerch received *332 constructive dividends from Power-Hose totaling $27,105 resulting from payments by Power-Hose of Mr. Lerch's personal expenses. The following is a list of those personal expenses still in dispute, respondent having conceded a $108 item: Auto Expense
$ 4,374
Travel and Entertainment
19,161
Legal and Professional
2,936
Life Insurance - Officers
526
Total
$26,997
Respondent also disallowed for lack of substantiation the following deductions: Excess Itemized Deductions
$10,946
Schedule C Deductions
Cost of Goods Sold
23,761
Business Expenses
14,890
Rental Expenses - Schedule E
25,662
Employee Business Expenses
7,078
Respondent further determined that all or part of Mr. Lerch's underpayment of tax for the taxable year 1981 was due to fraud under section 6653(b). By statutory notice of deficiency dated April 12, 1985, respondent determined that in 1981 Mrs. Lerch failed to report gains totaling $71,393 from transactions involving Canadian Treasury bills. [25] Respondent further determined that Mrs. Lerch failed to report rental income in the amount of $32,625 generated from property she owned jointly with her husband. [26] Since respondent *333 disallowed the excess itemized deductions on Mr. Lerch's 1981 tax return, and Mrs. Lerch thus no longer was required to itemize her deductions, respondent decreased Mrs. Lerch's taxable income by $1,562, representing the excess of the zero bracket amount over her claimed itemized deductions. *334 In an Amendment to Answer filed December 23, 1985, respondent claimed an increased deficiency pursuant to section 6214(a) for each of the taxable years 1977 and 1980. Respondent determined that petitioners received unreported interest income on term deposit investments from the Imperial Bank as follows: Interest
Nonresident Tax Withholding
Year
(U.S. Dollars)
(U.S. Dollars)
1977
$30,804.98
$4,620.17
1980
18,319.51
2,739.27
In addition, respondent determined petitioners received unreported gains in 1980 on the purchase and redemption of Canadian Treasury bills in the amount of $28,858.23 (U.S. dollars). [27] Thus, respondent determined in rounded figures a total of unreported gross income from Canadian sources for the taxable year 1977 in the amount of $30,805 (U.S. dollars) and for the taxable year 1980 in the amount of $47,177 (U.S. dollars). Respondent also claimed increases with respect to the additions to tax under section 6653(b) and section 6653(a) for the taxable years 1977 and 1980, respectively. *335 In an Amendment to Answer filed March 21, 1986, respondent claimed an increased deficiency pursuant to section 6214(a) for the taxable year 1979. Respondent determined that during 1979, petitioners received unreported interest income in the amount of $51,465.32 (Canadian dollars) attributable to term deposits with the Imperial Bank. Respondent also determined that the amount of $7,719.81 (Canadian dollars) was withheld by the bank for the nonresident tax due on the amount of interest earned. Thus, respondent determined petitioners failed to report $43,948 (U.S. dollars) of interest income in 1979 and that petitioners were entitled to claim a foreign tax credit of $6,592 (U.S. dollars) for such year. [28]
In addition, respondent determined that in 1979 petitioners were required to include the following unreported taxable income: Commissions paid to
20th Century Products
$19,342.09
Receipt of Constructive Dividends
from Power-Hose
Professional Services Expenses
10,056.25
Travel and Entertainment
16,840.02
Auto Expenses
1,102.28
Life Insurance Premiums
524.84
Value of three gold Krugerrands
1,470.00
*336 Respondent also determined that all or part of the underpayment of tax for the taxable year 1979 was due to fraud pursuant to section 6653(b) rather than negligence under section 6653(a) as determined in the notice of deficiency. OPINION The normal split burden of proof applies in this fraud case. Zack v. Commissioner,692 F.2d 28 (6th Cir. 1982), affg. a Memorandum Opinion of this Court, cert. denied 460 U.S. 1084 (1983). Petitioners have the burden of showing that respondent's deficiency determinations are incorrect. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). In addition, petitioners have the burden of proof with respect to the section 6653(a) negligence addition for 1980; Mrs. Lerch has the burden of proof with respect to the section 6653(a) negligence addition for 1981. Respondent, however, has the burden of establishing fraud on the part of petitioner Ronald L. Lerch by clear and convincing evidence for the years 1977, 1978, 1979, and 1981. Sec. 7454(a); Rule 142(b); Zack v. Commissioner,supra; *337 Stone v. Commissioner,56 T.C. 213, 220 (1971). In addition, in accordance with section 6214(a), respondent claimed increased deficiencies for 1977, 1979, and 1980. Respondent has the burden of proof with respect to these increased deficiencies as "new matter" raised in amended answers. Rule 142(a). Finally, the normal three-year statute of limitations (sec. 6501(a)) has run on the taxable years 1977 and 1978, and assessment and collection of any tax and additions for those years will be barred unless respondent can come within the exception of section 6501(c)(1) for fraud or the exception of section 6501(e) for substantial omission of gross income. I DEFICIENCY DETERMINATIONS
Respondent's deficiency determinations consist of numerous line item adjustments raising various issues. [29] However, these adjustments and issues essentially fall into two broad categories: (1) unreported income attributable to the sale of property, foreign investments, constructive dividends, rental income, and commissions and (2) the disallowance of various deductions, exemptions, and tax credits, including itemized deductions, Schedule C deductions, rental expenses, personal *338 exemptions, losses, and/or credits that petitioners failed to substantiate during audit. *339 A. Unreported Income
(1) Foreign Sourced Income
Respondent determined that petitioners received unreported income during each of the years in issue attributable to foreign investments and credited to account No. XX-X4168 maintained with the Imperial Bank in Quebec, Canada. The evidence clearly and convincingly establishes that the following amounts of interest were earned and credited to account No. XX-X4168 during each of the years in issue and the following amounts of foreign tax (nonresident tax) were withheld with respect to this interest earned during such years: Interest
Foreign Tax Withholdings
Year
(U.S. Dollars)
(U.S. Dollars)
1977
$30,804.98 $4,620.71 1978
30,041.28
4,506.17
1979
46,653.73
6,521.00
1980
18,319.51
2,739.27
1981
947.36
In addition, the following gains were realized on the purchase and sale of Canadian Treasury bills and were credited to account No. XX-X4168 during the taxable years 1980 and 1981: Year
U.S. Dollars
1980
$28,858.23
1981
49,357.04
Petitioners essentially concede that interest and gain were credited to account No. XX-X4168 during each of the years in issue *340 in the amounts listed above. Indeed, petitioners did not dispute the correctness of these figures on brief. [30] Rather, petitioners argue that the income generated from the Canadian investments and credited to account No. XX-X4168 was trust income and thus was not attributable to petitioners. Respondent argues that petitioners were joint owners of the assets placed in this account, and the money generated and credited to this account was properly attributable to petitioners. We agree with respondent. First, assuming that petitioners created a valid foreign trust *341 and transferred assets to this trust for the benefit of their children, the income generated by this trust would still be attributable to them. Pursuant to section 679(a)[31] petitioners would be treated as the owners of the trust during each of the years in issue. Moreover, pursuant to section 671[32] petitioners would have been required to report the yearly income of the trust on their Federal income tax returns for each of the years in issue. Consequently, even if we could find that a valid foreign trust existed for Federal income tax purposes, that would not relieve petitioners from the requirement to report the income generated from this trust on their Federal tax returns. However, here we find that petitioners simply created a passbook savings account with the Imperial Bank in Canada. *342 On September 9, 1976, petitioners deposited an amount of $344,977.24 (Canadian dollars) in account No. XX-X4168 with the Imperial Bank in Quebec, Canada. Although this account was styled in the name Ronald Lee Lerch and/or Dalene A. Lerch in trust for Kemberley [sic], Chris, and Tracy [sic], we are satisfied that there was no trust. [33]
There is no written instrument or document depicting the terms of this purported trust. Petitioners were the only signatories on this account. Petitioners retained complete dominion and control over this account at all times pertinent to this case. This is graphically demonstrated by the fact that in August of 1981, *343 Mr. Lerch, acting in his own name, transferred $546,000 (Canadian dollars) from account No. XX-X4168 to a Swiss bank account. Moreover, petitioners did not file any fiduciary tax returns (Forms 1041) during any of the years, and the record does not indicate that petitioners filed the information returns as required by sections 6048(a) and (c) with respect to foreign trusts. [34]
*344 In addition, on their 1979 and 1980 joint Federal tax returns and on their 1981 individual tax returns, petitioners answered "No" to the second question in Part III of Schedule B. See n. 20, supra. Thus, petitioners represented that they were not the grantors of, or transferors to, any foreign trust in being during any of those taxable year. In contrast, for the taxable years 1978, 1979, and 1981 (Mr. Lerch only in 1981), petitioners represented in Part III of Schedule B of their returns for such years that they had an interest in or signature or other authority over a foreign bank account at some time during these taxable years. Furthermore, during the years in issue, an amount in excess of $200,000 was earned and credited to this Canadian bank account. No distributions were made from this account to any of petitioners' children during any of the years in issue. Moreover, none of the income attributable to this account was reported by any of the children during these years. Based on the entire record, we are satisfied that petitioners did not create a trust entity recognized for Federal income tax purposes. The record clearly and convincingly establishes that petitioners *345 were the true owners of the income-producing property and retained complete dominion and control over it at all times. Thus, the income generated from this property is clearly taxable to them. See Zmuda v. Commissioner,79 T.C. 714 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). In summary, petitioners failed to report interest income in the amounts of $30,804.98, $28,190.28, $46,209.73, and $18,319.51 for the taxable years 1977, 1978, 1979, and 1980, respectively. [35] In addition, we conclude that petitioners failed to report short-term capital gains [36] in the amount of $28,858.23 in 1980, and each petitioner failed to report $24,678.52 in 1981. [37]
*346 (2) Unreported Rental Income
In the statutory notice of deficiency issued to Dalene A. Lerch for the taxable year 1981, respondent determined that Mrs. Lerch was the owner, jointly with her husband, of various rental properties (Pittsburgh Street and Kitch Street) and failed to report rental income from these properties in 1981 in the amount of $32,625. Petitioner Dalene A. Lerch has the burden of proof on this issue. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Respondent argues that in the State of Indiana, a husband and wife who own real estate are generally presumed to hold such property as tenants by the entirety unless a contrary intent is expressed. Ind. Code sec. 32-1-2-8 (1980); Brown v. Brown,133 Ind. 476, 32 N.E. 1128 (1893); Myler v. Myler,137 Ind. App. 605, 210 N.E. 2d 446 (1965). Respondent contends on brief that petitioners failed to offer any probative evidence of a precise allocation of the income generated by these properties and argues an equal distribution between petitioners would be reasonable under such circumstances. We agree. There is nothing in the record indicating that petitioners *347 held title to these properties other than as tenants by the entirety. At trial, Mr. Lerch referred to the property in question as "the property that the wife and I owned that we leased to the Company." In their opening brief, petitioners objected to allocating any rental income to Mrs. Lerch since Mr. Lerch reported the entire amount on his 1981 tax return. Petitioners argued that respondent was attempting to levy a double tax on this item, but that is not the case. [38] In any event, we conclude that Mrs. Lerch failed to report rental income in 1981 in the amount of $16,312.50 (half of $32,625) and Mr. Lerch is entitled to a corresponding reduction in the amount of rental income he reported on Schedule E in 1981. [39]
*348 (3) Sale of Maumee Property
Petitioners failed to report any gain on the sale of the Maumee property which was sold in April of 1977, and they claimed depreciation on that property for that entire year. Based on a sales price of $100,000, and after deducting the expenses of the sale in the amount of $835.83, respondent determined petitioners realized a long-term capital gain on the sale in the amount of $64,789.17. Thus, respondent determined petitioners had a taxable gain on the sale (after the section 1202 deduction) in the amount of $32,394.58 and increased their taxable income accordingly. Respondent also reduced the amount of depreciation claimed on this property to $561 to correspond with the period petitioners held the property during such year. Petitioners have the burden of proof on these issues. Welch v. Helvering,supra;Rule 142(a). Petitioners concede they failed to report any gain on the sale but argue the sales price was only $65,000 rather than $100,000. Thus, after deducting the expenses of the sale in the amount of $835.83, petitioners argue they realized a long-term capital gain in the amount of $29,787.17, resulting in taxable *349 gain of $14,893.58 after the section 1202 deduction. [40] However, the evidence establishes that the sales price was $100,000, and we thus sustain respondent's determination. See n. 16, supra. Petitioners conceded the depreciation issue on brief. (4) Constructive Dividends
Respondent determined that Power-Hose paid the following personal expenses of Mr. Lerch resulting in constructive dividend income to him: 1980
1981
Auto expense
$ 3,887.24
$ 4,374
Travel & Entertainment
15,402.39
19,161
Legal & Professional
7,800.00
2,936
Legal & Professional
3,656.45
Life Insurance-Officers
525.84
526
Total
$31,271.92
$26,997
In his amended answer for the taxable year 1979 filed March 21, 1986, respondent *350 claimed an increased deficiency pursuant to section 6214(a). Part of this increase was attributable to the receipt of constructive dividend income. Respondent asserted that Power-Hose paid the following personal expenses of Mr. Lerch resulting in constructive dividend income to him in 1979: Professional Services
$10,056.25
Travel & Entertainment
16,840.02
Auto Expense
1,102.28
Receipt of Gold Coins
1,470.00
Total
$29,468.55
Petitioners have the burden of proof with respect to the constructive dividends for the taxable years 1980 and 1981. Welch v. Helvering,supra;Rule 142(a). Respondent has the burden of proof with respect to the constructive dividends for the taxable year 1979, the issue being "new matter" raised in his amended answer. Rule 142(a). Section 61(a) defines gross income as all income from whatever source derived, including dividends. Sec. 61(a)(7). Under sections 301(a), 301(c)(1), and 316, a distribution of property made by a corporation to a stockholder generally is includable in the stockholder's gross income *351 as a dividend to the extent of the corporation's earnings and profits. A distribution under section 301 may be found even though the corporation has not formally declared a dividend. Crosby v. Commissioner,496 F.2d 1384, 1388 (5th Cir. 1974). The test for constructive dividends is twofold: Not only must the expenses be nondeductible to the corporation, but they must also represent some economic gain or benefit to the stockholder. Meridian Wood Products Co. v. United States,725 F.2d 1183, 1191 (9th Cir. 1984); Palo Alto Town & Country Village, Inc. v. Commissioner,565 F.2d 1388, 1391 (9th Cir. 1977). See also Ashby v. Commissioner,50 T.C. 409, 417-418 (1968). Thus, where a corporation makes a distribution to a stockholder which serves no legitimate corporate purpose and which results in an economic benefit to him, such benefit constitutes a constructive dividend to the extent of earnings and profits. Palo Alto Town & Country Village, Inc. v. Commissioner,supra,565 F.2d at 1391; Falsetti v. Commissioner,85 T.C. 332, 356 (1985). *352 Mr. and Mrs. Lerch were both shareholders of Power-Hose during the taxable years 1978 through 1981. Petitioners failed to produce the corporate books and records of Power-Hose or any other documents to substantiate the nature and purpose of the expenses paid by Power-Hose and characterized by respondent as constructive dividends. Petitioners have simply failed to prove that the expenses characterized by respondent as constructive dividends to petitioners were bona fide corporate business expenses rather than nondeductible expenses of Power-Hose representing some economic gain or benefit to petitioners as stockholders. Accordingly, we conclude that petitioners failed to report on their joint 1980 Federal income tax return the amount of $31,271.92 representing constructive dividends received by them that year, and Mr. Lerch failed to report on his 1981 individual Federal income tax return the amount of $26,997 representing constructive dividends received by him that year. [41]
*353 For the taxable year 1979, respondent has the burden of proof regarding the receipt of constructive dividends by petitioners during that year. Rule 142(a). As was the case for 1980 and 1981, the result for 1979 also turns upon who has the burden of proof. Respondent argues that petitioners utilized their positions with Power-Hose to divert corporate funds to personal uses over a three-year period. Respondent contends that petitioners received these funds in the form of travel and entertainment expenses, automobile expenses, legal and professional fees, and property of Power-Hose converted to their personal benefit. Respondent offered and the Court received in evidence various schedules prepared by respondent's agent. These schedules list in detail the various expenditures Power-Hose made in 1979 pertaining to automobile expenses, travel and entertainment expenses, and legal and professional fees. In addition, these schedules identify which items respondent determined represented personal expenses of petitioners resulting in constructive dividend to them in 1979. As we indicated at trial, we do not see any probative value in these various schedules beyond merely showing what *354 respondent determined was constructive dividend income. Without any supporting documentation, we do not see how respondent could prove these items were personal expenses of petitioners. Respondent has presented to probative evidence, and there is none in the record, that the items were indeed personal expenses of petitioners. Respondent has failed to carry his burden of proof in this instance. [42]
*355 Respondent nonetheless argues that he has identified particular expense items of a peculiarly personal nature that support his position on this issue. Respondent contends that Power-Hose paid Mr. Lerch's expenses for duck hunting trips, magazine subscriptions, and newspaper subscriptions delivered to his personal residence. Other expenses of a peculiarly personal nature include charges for the preparation of the tax returns of petitioners and their children, Mr. Lerch's legal expenses in certain personal litigation, and his receipt of three gold Krugerrands in connection with an embezzlement loss of Power-Hose. There does appear to be a pattern of Mr. Lerch's using his corporation to pay numerous personal and family expenses of a nondeductible nature. However, even if we sustain respondent's position on these various items, respondent has still failed to prove that payment of these expenses by Power-Hose constituted taxable income to petitioners. See n. 41, supra.
Generally, any corporate distribution of property, or in this case a deemed distribution of property, made by a corporation *356 to its shareholders is considered a dividend to the extent such distribution is out of the earnings and profits of the corporation. See sec. 316(a). Dividends or constructive dividends are included in gross income. See sec. 301(c)(1) and sec. 61(a)(7). That portion of a corporate distribution or deemed corporate distribution which is not a dividend is treated as gain from the sale or exchange of property to the extent the fair market value of the distribution exceeds the shareholder's adjusted basis in his stock. See sec. 301(c)(3). However, respondent has offered no probative evidence, and there is none in the record, concerning either the earnings and profits of Power-Hose or petitioners' adjusted basis in their stock. Accordingly, we hold for petitioners on this issue on respondent's failure to meet his burden of proof. (5) Unreported Commissions and Nonemployee Compensation
Respondent determined that in 1981 Mr. Lerch received nonemployee compensation from the Dynacraft Company in the amount of $15,750 that he failed to report that year. Petitioner Ronald Lerch has the burden of proof. Welch v. Helvering,supra;Rule 142(a). Mr. Lerch admits *357 that he received $15,750 in 1981 from the Dynacraft Company but testified and argues on brief he properly reported that amount on his 1981 Federal income tax return as part of the gross receipts of 20th Century Products. However, we need not accept petitioner's self-serving testimony, even if it is uncontradicted, if the Court finds the testimony unreasonable, improbable, or questionable. Lowell and Hart, Inc. v. Commissioner,456 F.2d 145, 148 (6th Cir. 1972); Ruark v. Commissioner,449 F.2d 311, 312 (9th Cir. 1971). On Schedule C attached to his Form 1040 for 1981, Mr. Lerch reported gross receipts from 20th Century Products in the amount of $50,496. However, Mr. Lerch failed to produce any business records of 20th Century Products or any other evidence to support his testimony. See nn. 24, 42, supra. There is no probative evidence in the record to establish that the amount he reported as gross receipts included the $15,750 he received from Dynacraft. Accordingly, we sustain respondent's determination with respect to this issue. In his amended answer for the taxable year 1979 filed March 21, 1986, respondent claimed an increased deficiency *358 for that year pursuant to section 6214(a). Part of this increase was attributable to payments 20th Century Products received from Power-Hose during 1979. Respondent determined that these payments totaling $19,342.09 represented commissions received from Power-Hose that Mr. Lerch failed to report as income in 1979. Respondent has the burden of proof with respect to this issue. Rule 142(a). Petitioners did not report this $19,342.09 as income in 1979. Mr. Lerch testified these payments received from Power-Hose during 1979 were payments on material that had been consigned to Power-Hose. Mr. Lerch stated "our basis was never really reached, so we never felt that there was any -- any profit or income there." For reasons discussed below, the Court did not believe Mr. Lerch's testimony. Respondent offered, and we received in evidence, copies of 10 canceled checks totaling $19,342.09. These checks, issued by Power-Hose to 20th Century Products, were all signed by petitioner Ronald Lerch on behalf of Power-Hose. A review of these checks indicates that all were negotiated and cashed during 1979. Several of these checks were endorsed for deposit only, others were simply endorsed *359 in the name of Ronald Lerch individually, and others were endorsed in the name of 20th Century Products. Petitioners did not file a Schedule C for 20th Century Products for 1979 and did not tell their accountant of the existence of that sole proprietorship that year. Documentation should be readily available to show if these payments were for materials consigned to Power-Hose and to show Mr. Lerch's basis therein, if such were the facts. We simply do not believe Mr. Lerch's convenient and wholly undocumented explanation of what those checks represent. In this instance, we think petitioner's failure to produce the documentation which respondent sought warrants an adverse inference as to what those documents would show. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Based on the record as a whole, we conclude respondent has carried his burden of proof and we sustain respondent's determination on this $19,342.09 commissions item. B. Deductions and Expense Items
(1) Itemized Deductions
The following are the excess itemized deductions claimed by petitioners for the taxable *360 years 1979, 1980, and 1981 (Mr. Lerch only) and the amounts disallowed by respondent in his statutory notices of deficiency for lack of substantiation: Year
Claimed
Disallowed
1979
$2,821
$2,821
1980
5,519
5,519
1981 (Mr. Lerch)
11,829
10,946
Petitioners failed to submit any receipts, canceled checks, or other documents or other evidence to substantiate their entitlement to the itemized deductions claimed. Accordingly, we sustain respondent's determinations on petitioners' failure to carry their burden of proof. [43]Welch v. Helvering,supra;Rule 142(a). (2) Schedule C Deductions
*361 (a) 20th Century Products
On Schedule C attached to their 1980 joint Federal tax return, petitioners reported gross receipts for 20th Century Products in the amount of $10,706 and deducted the amount of $9,332 as the cost of goods sold. Respondent disallowed the cost of goods sold deduction for lack of substantiation. On Schedule C attached to his individual 1981 Federal tax return, Mr. Lerch reported gross receipts for 20th Century Products in the amount of $50,496. Petitioner Ronald Lerch claimed deductions on Schedule C totaling $38,651 consisting of the cost of goods sold in the amount of $23,761 and other deductions in the amount of $14,890. Respondent disallowed both of these deductions for lack of substantiation. Petitioners failed to present any receipts, canceled checks, or other documents or other evidence to substantiate these claimed deductions. Accordingly, we sustain respondent's determination on petitioners' failure to carry their burden of proof. Rule 142(a). (b) Various Oil Wells
On Schedule C attached to their 1979 and 1980 joint Federal income tax return, petitioners reported gross receipts in the respective amounts of $3,608 and $3,712. For *362 1979, petitioners claimed operating expenses of $1,727 and a depletion allowance of $794. Respondent disallowed both of these amounts for lack of substantiation. For 1980, petitioners claimed operating expenses of $948, which respondent disallowed for lack of substantiation. Again, petitioners failed to submit any receipts, canceled checks, or other documents or other evidence to substantiate these claimed deductions. Accordingly, we sustain respondent's determination on petitioners' failure to carry their burden of proof. (3) Rental Expenses - Schedule E
On Schedule E attached to their 1979 and 1980 joint Federal tax returns, petitioners claimed total rental expenses in the amounts of $17,310 and $20,463, respectively. On Schedule E attached to his individual 1981 Federal tax return, Mr. Lerch claimed total rental expenses in the amount of $25,662. Respondent disallowed these expenses for each year for lack of substantiation. Again, petitioners failed to produce any receipts, canceled checks, or other documents or other evidence to substantiate these claimed deductions. Accordingly, we sustain respondent's determination on petitioners' failure to carry their burden *363 of proof. [44]
(4) Employee Business Expenses
On Forms 2106 attached to petitioners' 1979 and *364 1980 joint Federal tax returns, Mr. Lerch claimed deductible business expenses in connection with his employment with Power-Hose in the amounts of $4,485 and $6,943. By statutory notice of deficiency, respondent disallowed for lack of substantiation employee business expenses for these taxable years in the amounts of $21,799 [45] and $6,943, respectively. On Form 2106 attached to his individual 1981 Federal tax return, Mr. Lerch claimed deductible business expenses in connection with his employment with Power-Hose in the amount of $7,078. By statutory notice of deficiency, respondent disallowed the entire amount claimed for lack of substantiation. Petitioners have the burden of proof for these claimed employee business expenses. Rule 142(a). *365 Again, petitioners have simply failed to present any receipts, canceled checks, or other documents or other evidence to substantiate these claimed employee business expenses. Accordingly, we sustain respondent's determination with respect to these employee business expenses based on petitioners' failure to carry their burden of proof. [46]
(5) Political Contributions Credit
On their 1979 joint Federal income tax return, petitioners claimed a political contributions credit in the amount of $100. Respondent disallowed this political contributions credit for lack of substantiation. Again, petitioners failed to present any receipts, canceled checks, or other documents or other evidence to substantiate this claimed political contributions credit. Accordingly, we sustain respondent's determination based on petitioners' failure to carry their burden of proof. (6) Capital Losses
On Schedule D attached to their 1979 joint Federal tax return, petitioners reported *366 a net short-term capital loss of $835 and reported a long-term capital loss carryover of $7,540 and claimed the maximum $3,000 capital loss. On Schedule D attached to their 1980 joint Federal tax return, petitioners reported a net short-term gain of $1,209. Based on a long-term capital loss carryover of $3,210, petitioners claimed a capital loss in the amount of $1,001. Respondent disallowed for lack of substantiation petitioners' $3,000 capital loss claimed in 1979 and made adjustments in 1980 based on the disallowance of any long-term capital loss carryover to such year. On Schedule D attached to his 1981 individual Federal tax return, Mr. Lerch claimed a capital loss in the amount of $3,000, resulting from a claimed short-term capital loss of $18,116 from commodities transactions. Respondent disallowed this commodities loss for lack of substantiation and recomputed Mr. Lerch's taxable income accordingly. Petitioners failed to present any receipts, canceled checks or any other documents or other evidence to substantiate their entitlement to these claimed capital losses. Accordingly, we sustain respondent's determinations with respect to these losses on petitioners' failure *367 to carry their burden of proof. (7) Exemptions
In computing their tax liability for the taxable year 1979, petitioners claimed an exemption for each of their three children. Respondent disallowed these exemptions on petitioners' failure to verify that they had any children. However, based on the entire record, we are satisfied that petitioners indeed have three children who otherwise qualified as dependents in 1979. Accordingly, we hold for petitioners on this issue. II SECTION 6653 ADDITIONS
A. Section 6653(b) Fraud Additions
Respondent determined that the underpayments of tax for the taxable years 1977, 1978, 1979, and 1981 were due to the fraud of petitioner Ronald L. Lerch under section 6653(b). [47]Respondent bears the burden of establishing fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). The fraud envisioned by section 6653(b) is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Candela v. United States,635 F.2d 1272 (7th Cir. 1980); Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), *368 cert. denied 393 U.S. 1020 (1969); Mitchell v. Commissioner,118 F.2d 308 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), followed on remand 45 B.T.A. 822 (1941); Wilson v. Commissioner,76 T.C. 623, 634 (1981), Supplemental Opinion 77 T.C. 324 (1981). Respondent must show that the taxpayer intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,supra,398 F.2d at 1004; Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 112-113 (1956). Respondent must prove fraud in each of the years. Drieborg v. Commissioner,225 F.2d 216, 220 (6th Cir. 1955). *369 Fraud is a question of fact to be determined on the basis of the entire record. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), cert. denied 389 U.S. 912 (1967), affg. 37 T.C. 703 (1962); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Fraud can seldom be established by direct proof of the taxpayer's intention; therefore, the taxpayer's entire course of conduct must be considered, and fraudulent intent can be established by circumstantial evidence. Spies v. United States,317 U.S. 492 (1943); Gajewski v. Commissioner,supra,67 T.C. at 200; Stone v. Commissioner,supra,56 T.C. at 223-224; Otsuki v. Commissioner,supra,53 T.C. at 105-106. Specifically, we must consider the taxpayer's conduct and other circumstances surrounding the preparation, signing, and filing of the alleged fraudulent *370 returns. Foster v. Commissioner,391 F.2d 727, 733 (4th Cir. 1968). See also Wilson v. Commissioner,supra,76 T.C. at 634. Under section 6653(b), the fraud addition attaches to the entire deficiency even though only a portion of the underpayment is due to fraud. Mensik v. Commissioner,supra,328 F.2d at 150; Johnson v. United States,94 Ct. Cl. 345, 39 F. Supp. 103 (1941). See also Breman v. Commissioner,66 T.C. 61 (1976); Stewart v. Commissioner,66 T.C. 54 (1976). Absent an underpayment, there is nothing to which the fraud addition may attach. Sec. 6653(b). See Jenkins v. United States,313 F.2d 624, 627 (5th Cir. 1963). Consequently, the existence of an underpayment is an element of fraud that respondent must establish. See Hebrank v. Commissioner,81 T.C. 640, 642 (1983); Stone v. Commissioner,supra,56 T.C. at 220. *371 In a case such as this where the allegations of fraud for certain years are intertwined with the alleged omission of income, we must be extremely careful so that we do not bootstrap the finding of an underpayment requisite to a further finding of fraud upon a taxpayer's failure to carry his burden of proof with respect to the underlying deficiency for such years. See Drieborg v. Commissioner,supra,225 F.2d at 218; Estate of Beck v. Commissioner,56 T.C. 297, 363 (1971); Otsuki v. Commissioner,supra,53 T.C. at 106. A taxpayer's failure to satisfy his burden of proof as to the deficiencies determined by respondent does not constitute proof of fraud. George v. Commissioner,338 F.2d 221, 223 (1st Cir. 1964); Pigman v. Commissioner,31 T.C. 356, 370 (1958). In this case, petitioners have failed to meet their burden of proof on most of respondent's deficiency determinations. Wholly apart from their failure of proof, there is clear and convincing evidence in the record of understated taxable income that establishes an underpayment of tax in the years 1977, 1978, 1979, and 1981. Respondent *372 has established by clear and convincing evidence various amounts of unreported income consisting of interest and capital gain credited to petitioners' account at the Imperial Bank in Canada during such years and has established the first essential element of the fraud addition. Respondent must further establish by clear and convincing evidence that these underpayments of tax were due to fraud on the part of petitioner Ronald L. Lerch. We are satisfied from the record as a whole that respondent has established by clear and convincing evidence that all or part of the underpayments of tax in the taxable years 1977, 1978, 1979, and 1981 was due to the fraud of Mr. Lerch. Mr. Lerch failed to report a substantial amount of foreign-sourced interest and/or capital gains income in each of these years. Such a consistent pattern of underreporting substantial amounts of income over a period of several years, standing alone, is strong evidence of an intent to evade taxes. Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962); Cefalu v. Commissioner,276 F.2d 122, 129 (5th Cir. 1960); *373 Brooks v. Commissioner,82 T.C. 413, 431 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985); Vannaman v. Commissioner,54 T.C. 1011, 1018 (1970). Moreover, the record clearly and convincingly shows that Mr. Lerch's purpose in establishing the Canadian bank account was to evade the payment of Federal income taxes. Neither prior to nor at any time subsequent to the initial transfer of funds to the Canadian bank account did Mr. Lerch seek advice with respect to this account from Mr. Andorfer, his accountant, or fully disclose to him the facts about this account. Rather, Mr. Lerch provided Mr. Andorfer with false information as to the amount of income generated by this account as reflected on the Federal tax returns filed during these years. In addition, Mr. Lerch attempted to conceal from the Internal Revenue Service the existence of this account. Form 90-22.1 is required to be filed with the Department of the Treasury by each person who has a financial interest in or signature authority over one or more bank accounts in foreign countries if the aggregate value of all such accounts exceed $1,000. After learning *374 that there was a Canadian bank account and after preparing petitioners' joint 1979 and 1980 tax returns and Mr. Lerch's individual 1981 tax return, Mr. Andorfer attached a Form 90-22.1 to each return, with specific instructions for Mr. Lerch to complete and file these forms. The record shows that Mr. Lerch only filed one of these forms. However, even the form that was filed was unsigned and contained false information concerning the value of the Canadian bank account. We are satisfied that Mr. Lerch's failure to file correct Forms 90-22.1 properly disclosing the magnitude of petitioners' Canadian bank account was part of his overall attempt to evade the payment of tax on the income generated by this account. Moreover, Mr. Andorfer prepared Mr. Lerch's returns solely from information supplied by Mr. Lerch. The fact that no interest income from the Imperial Bank account was reported in 1977 and only $1,851 and $444 were reported in 1978 and 1979, respectively, when Mr. Lerch in fact received interest income of $30,804.98, $30,041.28, and $46,653.73 for those respective years, is telling evidence of his fraudulent intent. For each of the years 1977 through 1980, Mr. Lerch received *375 a Form NR4 from the Imperial Bank reflecting the amount of interest earned on the Canadian bank account with respect to those years. During the latter part of 1980 and in 1981, Mr. Lerch received statements from the Imperial Bank reflecting the amount of gain on each Canadian Treasury bill purchased and sold during those years. In August of 1981, Mr. Lerch, acting solely in his own name, transferred $546,000 from the Canadian Imperial Bank account to a bank account in Switzerland. Thenceforth, the trail of the money is lost. We are satisfied that Mr. Lerch had reason to know and knew that the amounts credited to Imperial Bank account No. XX-X4168 during the years in issue constituted taxable income that he should have reported. We conclude that Mr. Lerch knew exactly what he was doing -- i.e., evading the payment of his Federal income tax liability. The evidence clearly and convincingly establishes that petitioners underpaid their taxes in 1977, 1978, 1979, and that Mr. Lerch underpaid his taxes in 1981 and that the underpayment in each such year was due to the fraud of Mr. Lerch. Accordingly, petitioner Ronald L. Lerch is liable for the section 6653(b) fraud additions. B. *376 Section 6653(a) Negligence Addition
Respondent determined that petitioners were liable for the section 6653(a)(1) addition for negligence or intentional disregard of rules and regulations for the taxable year 1980. Respondent also determined that petitioner Dalene A. Lerch was liable for the 6653(a)(1) and (2) additions with respect to the taxable year 1981. Petitioners bear the burden of proof on this issue. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972); Rosano v. Commissioner,46 T.C. 681, 688 (1966). Petitioners have offered no evidence concerning the negligence additions and failed to address this issue on brief. Petitioners have failed to carry their burden of proof. Based on all the evidence of record, we are satisfied that the negligence additions are fully justified in this case. III STATUTE OF LIMITATIONS
Petitioners raised in their petitions for the taxable years 1977 and 1978 the affirmative defense of the statute of limitations under section 6501(a). [48]Rule 39. Petitioners' 1977 and 1978 joint Federal income tax returns were filed more than three years before respondent issued the notices of deficiency with *377 respect thereto. However, pursuant to section 6501(c)(1), which respondent properly raised in his answers, [49] the three-year period of limitations is inapplicable in the case of false or fraudulent returns with the intent to evade tax. [50] The elements of fraud that respondent must prove under 6653(b) are the same elements essential for a finding of fraud under 6501(c)(1). Tomlinson v. Lefkovitz,334 F.2d 262 (5th Cir. 1964), cert. denied 379 U.S. 962 (1965); Estate of Temple v. Commissioner,67 T.C. 143, 159-160 (1976); McGee v. Commissioner,61 T.C. 249, 256-257, 261 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). [51] Since respondent has proved underpayments of tax for the taxable years 1977 and 1978 and proved that part or all of such underpayments were due to petitioner Ronald L. Lerch's fraud, assessment and collection of taxes with respect to those years is not barred by the statute of limitations.[52]
*378 IV DUE PROCESS CLAIM
Petitioners assert a denial of due process, presumably under the Fifth Amendment to the Constitution of the United States. Petitioners state their claim in terms of a right to a full hearing and the right to introduce evidence and to have judicial findings based upon such evidence, ( Baltimore and O.R. Co. v. United States,298 U.S. 349 (1936)) and the right to notice and a "meaningful opportunity" to be heard ( Johnson v. United States Department of Agriculture,734 F.2d 774 (11th Cir. 1984)). Petitioners had ample notice of the trial setting and every opportunity to present their evidence during the two-day trial before this Court. See Appendix A for full details. Petitioners' real complaint is that this Court denied their motions for continuance of the trial, a matter within the sound discretion of a trial court. Compton v. United States,334 F.2d 212, 219 (4th Cir. 1964). Petitioners complain because this Court first denied their written motion for continuance, which they filed after the Bankruptcy Court had lifted the automatic stay (11 U.S.C. sec. 362(a)(8) (1982)) *379 specifically to permit the long-scheduled Tax Court trial to proceed. This Court then denied their oral motion for continuance, which they made after the Federal District Court, fully aware that the Tax Court had denied petitioners' written motion for continuance, upheld the action of the Bankruptcy Court. We think petitioners' arguments are without merit. Petitioners merely tried, and failed, to derail the Tax Court proceedings by filing voluntary petitions for bankruptcy virtually on the eve of a long-scheduled trial. This case, entailing as it does the exercise of sound judicial discretion by and comity among Federal courts, perhaps warrants some memorialization of the tortuous procedural history and litigation strategies pursued. See Appendix A. To reflect the concessions and the Court's holdings, Decisions will be entered under Rule 155
APPENDIX A Acting within our statutory deficiency jurisdiction (26 U.S.C. sec. 6213), we have redetermined the tax liability of petitioners herein. We will enter decisions under Rule 155 after the parties have submitted the necessary computations of the exact dollar amounts for each year. Entry of those *380 decisions will complete our task as a prepayment (deficiency) forum for these petitioners; that will also mark the accomplishment of the Bankruptcy Court's order that the trial in the Tax Court proceed as scheduled "to the extent of fixing the amount of tax liability, if any, that each of these debtors may have to the United States Government." Petitioners contend that our proceeding with the trial as scheduled (i.e., our refusal to continue the trial after the Bankruptcy Court had lifted the automatic stay (11 U.S.C. sec. 362(a)(8)) specifically to permit the trial to go forward) constitutes a denial of due process, presumably within the Fifth Amendment to the United States Constitution. We think petitioners were merely hoisted by their own petard. These cases had a tortuous procedural history before trial. In the 1983 and 1984 docket numbers, petitioners, through their counsel, had elected to have their trial in Phoenix, Arizona; in the three 1985 docket numbers, they had elected to have their trial in Indianapolis, Indiana. On November 8, 1985, the 1984 docket number was noticed for trial during the Phoenix, Arizona trial session of the Tax Court, scheduled *381 to begin on January 28, 1986. On December 27, 1985, the three 1985 docket numbers were noticed for trial during the one-week Indianapolis, Indiana trial session of the Tax Court, scheduled to begin on April 28, 1986. Merwin D. Grant, an attorney located in Phoenix, Arizona, had entered his appearance on behalf of Mr. and Mrs. Lerch in all five docket numbers. He filed a motion requesting to have the case calendared for trial in Phoenix continued, to have the place of trial for the two Phoenix cases changed to Indianapolis, Indiana, and to have those two cases consolidated with the cases calendared for trial in Indianapolis. This motion was granted by the Chief Judge by an order dated January 13, 1986. Accordingly, from that date of January 13, 1986, petitioners and their counsel, Merwin D. Grant, were on notice that all five docket numbers were set for trial in Indianapolis during the one-week trial session beginning April 28, 1986. Pursuant to the Tax Court's Standing Pre-Trial Order, respondent's counsel, Reid M. Huey, submitted his joint case status report dated March 28, 1986, reporting this case as a "probable trial" with an estimated trial time of 12 hours. The Court *382 also received petitioners' joint case status report dated April 3, 1986, in which Mr. Grant reported this case as a "probable trial" with an estimated trial time of three days. Such reports are required if, 30 days before the commencement of the trial session, the case has not yet been settled. The "probable trial" status is a report to the Tax Court that there is still a possibility of settlement before the scheduled trial session, but that absent settlement the case will be tried during that session. Mr. Grant also noted at the bottom of his status report that "Counsel for Petitioners and Respondent have conferred and are in the process of exchanging proposed stipulations and memoranda for presentation to the Court," as required by the Court's Standing Pre-Trial Order. Under the terms of the Standing Pre-Trial Order, if the case is not settled, the parties must submit their trial memoranda 15 days before the trial session begins. In accordance with the Court's Standing Pre-Trial Order, respondent's counsel submitted his trial memorandum, which the Court received on April 9, 1986. Without the permission of this Court, Mr. Grant failed to comply with the Court's Standing Pre-Trial *383 Order and did not file his trial memorandum. Normally, such a failure to comply with the Standing Pre-Trial Order would mean that petitioners would be precluded from offering any documents or calling any witnesses on their behalf. However, the Court did not preclude petitioners' presentation of evidence. They were permitted to offer any documents or call any witnesses they wished. When the Tax Court trial judge arrived at the Tax Court chambers in Indianapolis, Indiana, on Monday, April 28, 1986, there had been pushed through the mail slot of the judge's chambers a document entitled Report of Bankruptcy Filings, signed by one David Peebles and dated April 25, 1986. Mr. Peebles is an attorney but is not admitted to practice in the Tax Court. This report indicated that on April 23, 1986, petitioners had each filed a voluntary petition in bankruptcy in the United States Bankruptcy Court for the Northern District of Indiana, South Bend Division. Mrs. Lerch filed her petition for relief under Chapter 7 of the Bankruptcy Code (Case No. 86-30502) and Mr. Lerch filed his petition for relief under Chapter 11 (Case No. 86-30503). Later that morning, the Tax Court trial judge was advised *384 that on April 25, 1986, the United States of America (Internal Revenue Service) had filed a motion with the Bankruptcy Court to lift the automatic stay (11 U.S.C. sec. 362(a)(8)) with respect to both petitioners to permit the trial, briefing, opinion and decision for the 5 docket numbers. While the automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws, the Bankruptcy Judge may choose to lift the stay. 11 U.S.C. sec. 362(d). See Olson v. Commissioner,86 T.C. 1314, 1318 (1986); Thompson v. Commissioner,84 T.C. 645 (1985). On April 28, 1986, at 8:30 a.m., a hearing was held on this motion before the Honorable Robert K. Rodibaugh, Chief Judge of the United States Bankruptcy Court. By an order dated the same day, Judge Rodibaugh granted the motion and lifted the automatic stay with respect to both petitioners to the extent that: * * * trial will proceed in Indianapolis, Indiana, as scheduled, to the extent of fixing the amount of tax liability, if any, that each of *385 these debtors may have to the United States Government. Thereafter, the Government will file appropriate forms of claim in the two Bankruptcy cases and proceed no further until further order of the Bankruptcy Court. Thereafter, at the calendar call of the Tax Court trial session at 10:00 a.m. on April 28, 1986, this case was set for trial to commence at 9:00 a.m. on Thursday, May 1, 1986. Petitioners' counsel was so notified later that day. Later the same day, April 28, 1986, each petitioner, acting through Mr. Peebles, filed a Notice of Appeal with the United States District Court, Northern District of Indiana, for relief from the order of the Bankruptcy Court lifting the automatic stay. A hearing was scheduled for April 30, 1986. Also on April 28, 1986, Mr. Peebles prepared for petitioners' signature a "verified motion for continuance," supported by his affidavit, to be filed with the Tax Court. In that motion petitioners adverted to a sick grandchild, a claim that they would be denied the right to be represented by counsel, and stated that: Further, they were advised by their attorneys that it would not be necessary for the within case to be tried, because these issues *386 would become issues in the bankruptcy court, by reason of the fact that the taxes for 1982 and prior years would, pursuant to the provisions of Section 523 of the Bankruptcy Code, be prima facie dischargeable in bankruptcy, that to go forward in the Tax Court would be a waste of its time and would bring about a multiplicity of litigation. However, as Chief Judge Rodibaugh pointed out, the tax liability of the debtors (Mr. and Mrs. Lerch) must be determined. While the Bankruptcy Court has discretionary jurisdiction to determine such tax liabilities if it chooses to (11 U.S.C. sec. 505), it can allow the Tax Court to do so. Also, a distinction must be drawn between the individual debtors (Mr. and Mrs. Lerch, petitioners in these Tax Court cases) and the bankruptcy estate or the "debtor in possession." While the determination of the Tax Court will be binding against the individual debtors, it may or may not be binding against the bankruptcy estate or the "debtor in possession" unless the trustee in bankruptcy or the "debtor in possession" intervenes. The record indicates that the trustee (for Mrs. Lerch) and the "debtor in possession" (Mr. Lerch) evidenced *387 no inclination to intervene. The trustee apparently had no objection to the lifting of the automatic stay. In any event, whatever happens in regard to the bankruptcy estate and whether or not the tax liabilities determined by the Tax Court are dischargeable in bankruptcy are separate issues to be resolved by the Bankruptcy Court. [1] In any event, the "verified motion for continuance" was filed with the Tax Court on April 30, 1986 and was denied that day. *388 Later that afternoon, on April 30, 1986, a hearing was held before the Honorable Robert L. Miller, Jr., Judge, United States District Court, Northern District of Indiana, South Bend Division, for emergency relief from the order of the Bankruptcy Court lifting the automatic stay. In an order entered April 30, 1986, Judge Miller denied petitioners' request for emergency relief from the order lifting the automatic stay, finding that it "was supported by the facts and by the law and was a proper exercise of discretion." Before rendering his decision, Judge Miller was made aware of the fact that the Tax Court had denied petitioners' "verified motion for continuance." On Thursday, May 1, 1986, trial in these consolidated cases commenced as scheduled. Without permission of the Tax Court, Mr. Grant absented himself and failed to appear at the trial to represent petitioners herein. See n. 1, supra. Mr. Lerch again orally moved for a continuance. The Court again denied the motion. The trial then proceeded, with petitioners representing themselves. As noted earlier, petitioners were permitted to offer documentary evidence and to call any witnesses they desired. The trial lasted *389 for two days. Mr. Lerch testified selectively, often choosing to invoke the Fifth Amendment guarantee against self-incrimination. The Court is satisfied that Mr. Lerch had no reasonable basis to fear self-incrimination: there is no criminal tax investigation pending or contemplated; Mr. Lerch himself admitted he knew of no criminal investigation or criminal matter of any kind involving himself. However, the Court permitted him to decline to answer any question he chose not to answer. The Court, however, encouraged Mr. Lerch to go forward with his evidence, offering him a recess or additional time to review his notes or documents, which he declined. The Court is satisfied that Mr. and Mrs. Lerch had ample opportunity to present their evidence, had they chosen to do so. Most of the line item adjustments had been denied during audit for lack of substantiation. The Court is satisfied that petitioners knew what was required of them to substantiate the various deductions, credits, losses, etc. claimed on their tax returns. Mr. Grant filed post-trial briefs on petitioners' behalf, devoted largely to lamenting this Court's refusal to continue the trial of the case. This Court has *390 carefully reviewed the voluminous documentary evidence of record, and rendered its opinion as to petitioners' tax liabilities for the years 1977 through 1981. While the automatic stay is a fundamental debtor protection provided by the bankruptcy laws and is designed to provide the debtors "with a breathing spell from [their] creditors" ( Olson v. Commissioner,supra at 1318), petitioners' "breathing spell" has not been impaired in any way. This Court has merely redetermined the debtors' Federal tax liabilities; the debtors still have their "breathing spell" from the Internal Revenue Service as a creditor. The Bankruptcy Judge's order expressly provided that after this Court's redetermination of deficiencies, "the Government will file appropriate forms of claim in the two bankruptcy cases and proceed no further until further order of the Bankruptcy Court." (Emphasis added.) Most of the debts listed in petitioners' bankruptcy petitions seem to relate to the tax liabilities in these Tax Court cases and to legal fees owed to Mr. Grant and another attorney. This Court is justifiably concerned by what it perceives may have been an improper attempt to use *391 the filing of voluntary bankruptcy proceedings, with its automatic stay under U.S.C. sec. 362(a)(8), as a device to force a continuance of a trial that this Court would otherwise refuse to continue. If that was the stratagem contemplated by petitioners herein, their eleventh hour effort to derail the Tax Court proceeding failed. The action of the Bankruptcy Court, in exercising its sound discretion to lift the automatic stay, and of the Federal District Court, in upholding the Bankruptcy Judge's action, should sound fair warning to litigants that the judicial processes of the courts cannot be abused. Petitioners plead that they have been deprived of a "meaningful opportunity" to be heard in violation of their due process rights because the Tax Court would not continue the trial of their case. In the factual setting of this case, this plea comes with particularly poor grace. Without ever communicating with this Court until the day the Tax Court trial session began, petitioners created their own problems by filing voluntary petitions in bankruptcy on the eve of a long-scheduled trial and by their failure to resolve their fee dispute with their tax attorney. This brings to mind *392 the story of the little boy who murdered his parents and then asked the Court for mercy because he was an orphan. Footnotes
1. Cases of the following petitioners are consolidated herewith: Ronald L. Lerch and Dalene A. Lerch, docket No. 24683-84; Ronald L. Lerch, docket No. 26729-85; Ronald L. Lerch and Dalene A. Lerch, docket No. 26730-85; Dalene A. Lerch, docket No. 26731-85.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
3. Respondent also determined that Dalene Lerch was liable under section 6653(a)(2)↩ for fifty percent of the interest due on $61,549.
4. Respondent concedes that the amount of $108 paid by Power-Hose Couplings, Inc., during the taxable year 1981 in connection with an automobile lease and the insurance reimbursement check in the amount of $25,000 received from Power-Hose Couplings, Inc., during the taxable year 1980 did not constitute constructive dividend income to petitioners. Finally, respondent concedes that no part of the underpayment of tax for the taxable years 1977, 1978, 1979, and 1981 was due to any fraud on the part of petitioner Dalene A. Lerch. Petitioners concede that each of them received director's fees in the amount of $1,000 during each of the taxable years 1979, 1980, and 1981 and inadvertently failed to include these amounts as income during such years. Petitioners also concede that the life insurance premiums paid by Power-Hose during 1979 totaling $524.84 constitute taxable income to them. Petitioners also concede that in 1977 they erroneously claimed depreciation in the amount of $1,122 on the Maumee Avenue property after they had sold that property.↩
5. For one or two years, Mrs. Lerch also maintained an individual checking account. She occasionally stayed at her mother's house on Lake James and used this account to write checks for groceries and other personal items while she was there. Deposits to this account were generally made by Mr. Lerch at Mrs. Lerch's request. In addition, petitioners maintained a joint bank account in Switzerland during all the years in issue. Mr. Lerch testified that a balance of approximately $1,600 was maintained in this account during these years. He stated the account was established in case petitioners needed extra money while on vacation in Europe. Mrs. Lerch has never been to Europe, and she testified she did not know whether or not her husband had ever been to Europe.↩
6. This corporation is now known as Power Products, Incorporated. Power-Hose has been involved in three tax cases in this Court that were handled by petitioners' counsel, Merwin D. Grant -- docket No. 13267-82 (taxable year 1978); docket No. 23569-83 (taxable year 1979); and docket No. 16617-85 (taxable year 1981).↩
7. Mr. Lerch testified that he did not believe that either he or his wife were shareholders of Power-Hose during the period of 1979 through 1981. He suggested that he and his wife held stock in Power-Hose in trust for their children but produced no documentation in support thereof. In any event, we are satisfied that both Mr. and Mrs. Lerch were shareholders of Power-Hose during the years 1978 through 1981. The minutes of the annual stockholders' meetings during those years clearly state that petitioners were stockholders in Power-Hose during such period.↩
8. Mr. Lerch testified, inter alia, "I was president of the company. I didn't have anybody okaying my expense account" and "I didn't think it was my employees' business what my personal expenses were and who I saw."↩
9. On Schedule A item 31 of their 1980 joint tax return, petitioners claimed an expense of $1,172 as business publications. Apparently, these are the same items that were paid for by Power-Hose.↩
10. In November of 1979, Mr. Lerch discovered that Bonnie Brotherton with the help of her boyfriend had been embezzling funds from Power-Hose since 1977. In 1979, Mr. Lerch received three gold Krugerrands from Bonnie Brotherton. Power-Hose eventually obtained a judgment against her for the embezzlement loss. She was given credit in that judgment for the three gold Krugerrands she had given to Mr. Lerch. On or about July 18, 1981, petitioners filed an insurance claim with the Hartford Insurance Company in connection with a theft. Included in this claim were three gold Krugerrands valued at $1,275. The proof of claim submitted to the insurance company was signed by Mr. Lerch and certified as correct. Petitioners did not report as income in 1979 or 1980 the value of these gold Krugerrands.↩
11. The Federal tax returns that Mr. Andorfer prepared for Chris Lerch and Kimberly Lerch for 1981 were never filed with the Internal Revenue Service. A review of the tax returns of Chris, Kimberly, and Tracey prepared by Mr. Andorfer indicates that for the years in which refunds were due the returns were filed, and for the years in which additional taxes were owed the returns were not filed. ↩
12. Mr. Andorfer also prepared Federal tax returns for Tracey Lerch for the taxable years 1980 and 1981. While Mr. Andorfer testified he charged Power-Hose for the preparation of the childrens' returns, the record does not contain specific documentary evidence of such charges for Tracey as it does in the case of the other children.↩
13. The income listed for Dalene Lerch on her 1981 separate return was identified on the return as interest income paid to her by Power-Hose.↩
14. The Court did not believe Mr. Lerch's testimony that he terminated Mr. Andorfer's services.↩
15. During examination of petitioners' 1977 tax return in February of 1985, Mr. Lerch told the revenue agent, Pamela H. McFadden, that he was aware the sale of the Maumee property was not reported in 1977. He told her that the sales price was $50,000, equal to his cost basis, and consequently no gain or loss was realized on the sale. Mr. Lerch testified he did not recall having such a conversation with Pamela McFadden regarding the Maumee property sale. However, we found Mr. Lerch's testimony evasive and unworthy of belief. We are satisfied that Mr. Lerch told Pamela McFadden the sales price was $50,000 and that he had no gain on the sale, which were lies. Petitioners now admit that they had gain on the sale, but they contend the gain was less than the amount respondent determined. ↩
16. There is a conflict in the evidence as to whether the sales price was $100,000 or $65,000. An Agreement to Purchase Real Estate executed by petitioners on November 26, 1976, that was offered by petitioners and received into evidence reflects a sales price of $65,000 for the Maumee property. Another Agreement to Purchase Real Estate also executed by petitioners on November 26, 1976, was offered by respondent and received into evidence. The two agreements are essentially identical except the agreement offered by respondent reflects a total sales price for the Maumee property in the amount of $100,000. Mr. Lerch testified that the correct sales price was $65,000. Ruth Liechty, one of the buyers of the Maumee property and also a real estate broker, testified she believed the sales price of the Maumee property was $65,000. However, she did not recall being present at the closing and we have accorded little weight to her testimony. There is no satisfactory explanation as to why there were two different sales agreements executed by petitioners on November 26, 1976, each with a different sales price. In any event, we are satisfied that the sales price of the Maumee Property was $100,000. The Mortgage Loan Department Settlement Sheet of the sale clearly indicates that the sales price was $100,000. The settlement sheet also indicates that petitioners received a down payment of $36,000 with $64,000 due at closing. The $36,000 down payment was described as including "equity on trade-in of office facility at 3130 E. Washington Blvd." The cashier's check in the amount of $63,164.17 that petitioners received from the sale represents the $64,000 balance due less the expenses of the closing attributable to the sellers.↩
17. At trial Mr. Andorfer suggested that soon after the sale Mr. Lerch informally told him about the sale, but that the next year when he prepared the return for 1977 he simply forgot about the sale of the Maumee property. From this petitioners argue that this omission was simply an error made by their return preparer. We view the matter differently. Mr. Lerch furnished Mr. Andorfer all oral or written information that was used in the preparation of the tax return each year. The information as to this sale was peculiarly available to Mr. Lerch, not to Mr. Andorfer. Also, the detailed depreciation schedule in regard to the Maumee property would have reminded Mr. Andorfer if he in fact had ever been told about the sale prior to the time the 1977 return was prepared. More importantly, the most cursory examination of that depreciation schedule by Mr. Lerch would have alerted him to the Maumee property matter. In view of the fact that that single item was larger than petitioners' adjusted gross income reported for 1977, the Court simply does not believe Mr. Lerch's testimony that he overlooked the item.↩
18. On or about October 17, 1979, account No. XX-X4168 was debited in the amount of $4,690.43 (Canadian dollars) for the purchase of ten maple leaf gold coins. This amount consisted of the purchase price of $4,678.74 and bank commissions of $11.69. Except for this initial purchase, there is no evidence in the record with respect to these ten maple leaf gold coins.On or about October 17, 1979, account No. XX-X4168 was debited in the amount of $4,690.43 (Canadian dollars) for the purchase of ten maple leaf gold coins. This amount consisted of the purchase price of $4,678.74 and bank commissions of $11.69. Except for this initial purchase, there is no evidence in the record with respect to these ten maple leaf gold coins.↩
19. The U.S. dollar amounts were computed based on the current foreign exchange rate applicable on the date that the interest from these term deposits was credited to account No. XX-X4168. The current foreign exchange rate for each date was determined from the foreign exchange table published in the Wall Street Journal. dollar amounts were computed based on the current foreign exchange rate applicable on the date that the interest from these term deposits was credited to account No. XX-X4168. The current foreign exchange rate for each date was determined from the foreign exchange table published in the Wall Street Journal.↩
20. PART III Foreign Accounts and Foreign Trusts If you are required to list interest in Part I or dividends in Part II, OR if you had a foreign account or were a grantor of, or a transferor to a foreign trust, you must answer both questions in Part III. (See page 18 of instructions.) 1. Did you, at any time during the taxable year, have any interest in or signature or other authority over a bank, securities, or other financial account in a foreign country (except in a U.S. military banking facility operated by a financial institution)? Yes     No If "Yes," see page 3 of instructions. 2. Were you the grantor of, or transferor to, a foreign trust during any taxable year, which foreign trust was in being during the current taxable year, whether or not you have any beneficial interest in such trust? Yes     No If "Yes," you may be required to file Forms 3520, 3520-A, or 926. Part III of Schedule B for all the years in issue contains essentially the same information except for minor modifications in the specific language not pertinent herein.↩
21. Mr. Lerch testified that he could not tell whether or not he made the entry on question 1 of Part III on Schedule B. However, based on the entire record, we are satisfied that Mr. Lerch indeed made the entry on this portion of Schedule B.↩
22. Form 90-22.1 must be filed with the Department of the Treasury on or before June 30 of the succeeding year by each United States person who has a financial interest in or signature authority or other authority over one or more bank accounts, securities accounts, or other financial accounts in foreign countries. However, Form 90-22.1 is not required to be filed if the aggregate value of all such accounts did not exceed $1,000 at anytime during the calendar year, but if the amount does not exceed $10,000 certain portions of the form need not be filled out. The record indicates that only one such form was filed during all the years in issue. The form that was filed was assigned docket control number 800162990 and was filed in Mr. Lerch's name only. The form that was filed was unsigned and it appears to be a copy of the Form 90-22.1 that Mr. Andorfer prepared and attached to petitioners' joint 1979 tax return.↩
23. Most of these Canadian Treasury bills matured in either 28 or 35 days. The others had maturity dates of 42, 63, and 91 days, respectively.↩
24. The Court did not believe Mr. Lerch's testimony that these commissions were included in the $50,496 figure. While Mr. Lerch testified he had records showing that, he conveniently forgot to bring them with him to Court.↩
25. In separate notices of deficiency issued to each petitioner for the taxable year 1981, respondent determined that each petitioner failed to report gains in the amount of $71,393 from the sale of Treasury bills. Respondent concedes on brief that each petitioner should have reported only one-half of the total gain for that year and the total gain in 1981 was $49,357.04 rather than $71,393. The record indicates, however, that when determining the U.S. dollar equivalent for the gains, respondent divided the Canadian gain amount by the exchange rate rather than multiplying the Canadian amount by the applicable exchange rate. Respondent used the proper computation method in his brief, and the Court in its findings has made some minor arithmetical corrections to respondent's revised figures. See nn. 28, 30, infra.↩
26. Respondent concedes on brief that Mr. Lerch is entitled to reduce the amount of rental income he reported on Schedule D with respect to the rental income Mrs. Lerch is required to report on her 1981 tax return.↩
27. Apparently, respondent now contends that the income from the Canadian securities is short-term capital gain rather than dividend income as determined in his notice of deficiency and appears to have conceded the dividend income issue.↩
28. See n. 25, supra,↩ in regard to error in computational method that has now been rectified.
29. Petitioners stated in their opening brief that they thought respondent was planning to concede "that there is not proof sufficient to carry the allegations of liability against Dalene Lerch." Anticipating this concession by respondent, petitioners call our attention to section 6013(e), the innocent spouse provision, and urge its applicability. However, petitioners were simply mistaken as to respondent's concession. Respondent conceded on brief that the underpayment of tax for each of the years 1977, 1978, 1979, and 1981 was not due to any fraud on the part of petitioner Dalene A. Lerch under section 6653(b). However, a concession of the addition to tax for fraud under section 6653(b) for which respondent has the burden of proof does not automatically trigger the applicability of section 6013(e). Section 6013(e) is an affirmative defense that must be set forth in the pleadings, with the burden of proof on petitioners. Rules 39 and 142(a). Here the innocent spouse issue was neither pleaded by petitioners nor tried by agreement of the parties. Rule 39; Rule 41(b)(1). Petitioners first raised the innocent spouse issue on brief. New matters first raised on brief will not be considered. Rollert Residuary Trust v. Commissioner,80 T.C. 619, 636 (1983), affd. on other issues 752 F.2d 1128 (6th Cir. 1985); Markwardt v. Commissioner,64 T.C. 989, 997 (1975); Estate of Mandels v. Commissioner,64 T.C. 61, 73 (1975); Frentz v. Commissioner,44 T.C. 485, 491 (1965), affd. without discussion of this issue 375 F.2d 662 (6th Cir. 1967). Moreover, even if the innocent spouse issue were properly before the Court, the facts would not support its application here. Mrs. Lerch knew or should have known of the unreported income and she benefited from it. See section 6013(e)(1)(C) and (D). See also Krampf v. Commissioner,T.C. Memo. 1983-382; Bourque v. Commissioner,T.C. Memo. 1980-286↩.
30. At trial and on brief, petitioners pointed out an error in respondent's computations in converting the amount of gain realized in 1981 from Canadian to the U.S. dollar equivalent. Respondent essentially divided the Canadian dollar by the applicable exchange rate rather than multiplying, resulting in a highly distorted figure. The same error occurred for the taxable years 1978 and 1981 (Mr. Lerch only) with respect to the amount of interest earned. Respondent has corrected these figures on brief and the correct figures, with minor arithmetical corrections by the Court, are reflected in the findings of fact.↩
31. Section 679(a) states: (a) Transferor Treated as Owner. -- (1) In General. -- A United States person who directly or indirectly transfers property to a foreign trust (other than a trust described in section 404(a)(4) or 404A(a)(4)) shall be treated as the owner for his taxable year of the portion of such trust attributable to such property if for such year there is a United States beneficiary of any portion of such trust. ↩
32. Section 671 provides in pertinent part: Where it is specified in this subpart that the grantor or another person shall be treated as the owner of any portion of a trust, there shall then be included in computing the taxable income and credits of the grantor or the other person those items of income, deductions, and credits against tax of the trust which are attributable to that portion of the trust to the extent that such items would be taken into account under this chapter in computing taxable income or credits against the tax of an individual. * * *↩
33. Franco Marinelli, assistant manager of the Canadian Imperial Bank, testified that his bank in the Province of Quebec does not require any legal documents as such for parents to establish a trust account for the benefit of their children, and that a simple oral request by the parents is sufficient. However, whether or not such oral trusts are enforceable under Canadian law is not an issue in this case. The record contains no evidence that a valid trust existed for Federal income tax purposes, or for any other purpose.↩
34. As in effect during the years in issue, section 6048 provides in pertinent part: (a) General Rule. -- On or before the 90th day after- (1) the creation of any foreign trust by a United States person, or (2) the transfer of any money or property to a foreign trust by a United States person, the grantor in the case of an inter vivos trust, the fiduciary of an estate in the case of a testamentary trust, or the transferor, as the case may be, shall make a return in compliance with the provisions of subsection (b). (b) Form and Contents of Returns. -- The returns required by subsection (a) shall be in such form and shall set forth in respect of the foreign trust, such information as the Secretary prescribes by regulation as necessary for carrying out the provisions of the income tax laws. (c) Annual Returns for Foreign Trusts Having One or More United States Beneficiaries. -- Each taxpayer subject to tax under section 679↩ (relating to foreign trusts having one or more United States beneficiaries) for his taxable year with respect to any trust shall make a return with respect to such trust for such year at such time and in such manner, and setting forth such information, as the Secretary may by regulations prescribe.
35. The unreported interest income for the taxable years 1978 and 1979 reflects downward adjustments of $1,851 and $444, respectively, since those amounts were reported as interest from the Imperial Bank on their joint Federal tax returns for those years. ↩
36. Petitioners have not argued any alternative characterization of these gains. In any event, the record clearly indicates that each Canadian Treasury bill was purchased and sold during 1980 and 1981 within a period of 28 to 91 days. ↩
37. In separate statutory notices of deficiency issued to petitioners for the taxable year 1981, respondent determined that each petitioner failed to report the entire amount of short-term capital gains credited to account No. XX-X4168In separate statutory notices of deficiency issued to petitioners for the taxable year 1981, respondent determined that each petitioner failed to report the entire amount of short-term capital gains credited to account No. XX-X4168 during that year. On brief, respondent conceded that each petitioner had a one-half interest in account No. XX-X4168 during that year. On brief, respondent conceded that each petitioner had a one-half interest in account No. XX-X4168 and each was required to report only one-half of the total amount of income earned during that year. We agree. The record clearly indicates that petitioners were the only signatories on this account and they were authorized to sign either/or on this account. Absent anything in the record to the contrary, we conclude that each petitioner failed to report as income in 1981 one-half of the $947.36 of interest and one-half of the $49,357.04 of short-term capital gains credited to account No. XX-X4168 during 1981. and each was required to report only one-half of the total amount of income earned during that year. We agree. The record clearly indicates that petitioners were the only signatories on this account and they were authorized to sign either/or on this account. Absent anything in the record to the contrary, we conclude that each petitioner failed to report as income in 1981 one-half of the $947.36 of interest and one-half of the $49,357.04 of short-term capital gains credited to account No. XX-X4168 during 1981.↩
38. In his proposed finding of fact No. 191, respondent requested the following: Petitioner Dalene A. Lerch was required to report as income during 1981 the amount of $16,312.50 received from rental properties. Moreover, respondent conceded on brief that Mr. Lerch would be entitled to a corresponding reduction in the rental income he reported on Schedule E from these properties in 1981. In their reply brief, petitioners did not object to respondent's proposed finding of fact No. 191 and apparently now agree with respondent's treatment. ↩
39. We note that one-half of the rental expenses attributable to this property and claimed by Mr. Lerch on his 1981 Federal tax return is also properly allocable to Mrs. Lerch. However, petitioners failed to present any records or receipts to substantiate these claimed expenses and accordingly have failed to satisfy their burden of proof.↩
40. Petitioners computed their gain using an adjusted basis of $34,375, the same amount used by respondent computed as follows: ↩
Computation of Basis
Land
$3,000
Building
47,000
Improvements
1,363
$51,363
Less: prior years' depreciation
Land
Building
15,745
Improvements
682
16,427
$34,936
Less: depreciation in
year of sale
Land
Buildings
470
Improvements
91
561
Adjusted Basis:
$34,375
41. Petitioners presented no evidence and no evidence is contained in the record in regard to the corporation's earnings and profits. Therefore, petitioners have failed to meet their burden of proving that any distributions received from the corporation were not out of its earnings and profits and not taxable as ordinary income under sections 301(c)(1), 316(a), and 61(a)(7). In addition, petitioners have not argued and we have not considered whether any of the constructive dividends received in 1981 are properly allocable to Mrs. Lerch. In any event, there is nothing in the record to support such an allocation.↩
42. We are fully cognizant of the difficulty of respondent's situation. Respondent's failure to present the underlying supporting documents was due directly to Mr. Lerch's failure to comply with respondent's Subpoena Duces Tecum specifically requesting Mr. Lerch, as president of Power-Hose, to produce, among other things, the various corporate records pertaining to the above corporate expenditures during 1979. However, those documents should have been obtained by respondent well before trial through use of the Court's discovery procedures. Rule 72. Even so, had petitioners' counsel been present to advise them at the trial and were there not fraud issues in the case, we might have considered the imposition of sanctions under Rule 104 for Mr. Lerch's failure to comply with the Court's subpoena or we might have drawn an adverse inference as to what the withheld records showed. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513↩ (10th Cir. 1947). In this instance, we will not do so, and will instead decide the issue on burden of proof, as we did with petitioners for the two later years.
43. In a separate statutory notice of deficiency issued to Dalene A. Lerch for the 1981 taxable year, respondent decreased her taxable income by $1,562 representing the excess of the zero bracket amount over the itemized deductions she claimed. Since Mr. Lerch failed to substantiate his claimed itemized deductions for 1981 and no amount in excess of the zero bracket amount was allowed, Mrs. Lerch is no longer required to itemize her deductions and is entitled to the benefit of the full zero bracket amount, as respondent has determined.↩
44. Petitioners argue for an application of what they call the "fairness doctrine" with respect to the disallowance of the depreciation and the interest expense claimed on their rental property for the taxable years 1978, 1979, and 1981. Petitioners contend that similar deductions were allowed for the taxable years 1977 and 1980. We assume petitioners are requesting us to apply the Cohan principle with respect to these items. We note that petitioners are mistaken with respect to the rental expenses for the 1980 and the 1978 taxable years. Respondent disallowed all the rental expenses for 1980 but allowed the rental expenses for 1978. In any event, the allowance of similar expenses in 1977 and 1978 has no bearing on other taxable years. Moreover, the record in this case provides no basis for making a reasonable allocation pursuant to Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). Under such circumstances, a deduction based on the Cohan rule would be "unguided largesse." Williams v. United States,245 F.2d 559↩ (5th Cir. 1957).
45. On Form 2106 filed for the taxable year 1979, Mr. Lerch claimed entertainment and travel expenses in the amount of $21,799. However, he reduced this amount by $17,314 representing the portion of these expenses paid by Power-Hose and not included on his Form W-2. Thus, Mr. Lerch claimed a deduction for employee business expenses in the amount of $4,485 as listed on line 24 of the Form 1040. Accordingly, an adjustment to the amount of employee business expenses respondent disallowed for 1979 is required.↩
46. For the taxable year 1979, we sustain respondent's determination to the extent of $4,485, the amount Mr. Lerch claimed as a deduction for employee business expenses in such year. See n. 45, supra.↩
47. As in effect during the years in issue, section 6653(b) provided as follows: (b) Fraud. -- If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse. As noted earlier, respondent conceded that the underpayments of taxes for the taxable years 1977, 1978, 1979, and 1981 were not attributable to any fraud on the part of petitioner Dalene A. Lerch.↩
48. Sec. 6501 provides in pertinent part that: (a) General Rule. -- Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. ↩
49. Respondent also alleged that assessment and collection of taxes for the taxable years 1977 and 1978 was not barred by the statute of limitations and may be timely assessed pursuant to section 6501(e)(1)(A). However, due to our finding of fraud pursuant to section 6501(c)(1), it is unnecessary to address the applicability of section 6501(e)(1)(A). In any event, the facts clearly indicate that absent a finding of fraud, assessment and collection of taxes for the taxable years 1977 and 1978 could be timely assessed pursuant to section 6501(e)(1)(A)↩. 50. Section 6501(c) provides in pertinent part that: (c) Exceptions. -- (1) False Return. -- In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. ↩
51. See also Phillips v. Commissioner,T.C. Memo. 1984-133; Rinehart v. Commissioner,T.C. Memo. 1983-184↩. 52. Respondent conceded that the underpayments of tax for the taxable years 1977, 1978, 1979, and 1981 were not due to any fraud on the part of petitioner Dalene A. Lerch. However, respondent's proof of fraud by Mr. Lerch prevents the running of the statute of limitations so that Mrs. Lerch remains liable for the deficiencies for the taxable years 1977 and 1978 unless she timely claims and proves that she qualifies as an innocent spouse under 6013(e). Stone v. Commissioner,56 T.C. 213, 227-228 (1971); S. Rept. No. 91-1537, 91st Cong., 2d Sess., 1971-1 C.B. 606, 608. This she has not done. See n. 29, supra.↩
1. Mr. Peebles in his affidavit in support of the motion for continuance seems to ignore the fact that the individual debtors are the petitioners in the Tax Court, not the bankruptcy estate. Mr. Peebles says: Pursuant to Sections 327 and 329 of the Bankruptcy Code (Title 11, U.S.C.), copies of which are appended hereto, said petitioners' tax counsel, Merwin Grant, is not qualified to represent them by reason of the constraints contained therein. No attempt was made to comply with such requirements on behalf of Mr. Grant for the reason that the same were totally believed to be unnecessary until the ruling of April 28, 1986 and, by reason of the press of other business and the distance of Mr. Grant from the undersigned, it will not be reasonably possible for such statutes to be complied with. Further, Mr. Grant has indicated to the undersigned that by reason of the substantial amount of his unpaid invoices for services, he may not wish to re-enter upon representation in this case, and it is impossible for replacement counsel to be obtained in time for adequate preparation to represent the petitioners herein during the present calendar. We think it is clear from this motion for continuance and Mr. Peebles' affidavit that petitioners viewed bankruptcy as a way to avoid the determination of their tax liabilities and perhaps even to avoid their tax liabilities altogether. It is also clear that the purported problem with Mr. Grant, their Tax Court attorney, was simply a fee dispute, not a putative legal disability to handle the pending Tax Court case. Mr. Grant is admitted to practice in the Tax Court; he had entered his appearance in each docket number; he has never moved to withdraw from his representation of these taxpayers and this Court has not allowed him to withdraw and would not allow him to withdraw on the eve of a long-scheduled trial. If, as may be the case, Mr. Grant stopped his trial preparations because of a fee dispute and/or in anticipation that petitioners would file bankruptcy petitions and that the Tax Court proceedings would be stayed, he and petitioners did so entirely at their own risk. This Court never relieved Mr. Grant or petitioners of the requirements of full compliance with the Standing Pre-Trial Order at any time prior to May 1, 1986 when the trial began.↩